# LYNN KAHLENBERG ET AL v. BERNARD M. GOLDSTEIN

[No. 63, September Term, 1980.]

*Decided June 23, 1981.*

478

Action by Lynn Kahlenberg and Bernard Kahlenberg, her father, against Bernard M. Goldstein for negligent entrustment of an automobile. From a verdict in favor of the plaintiffs, the defendant appealed to the Court of Special Appeals, which reversed. *Goldstein v. Kahlenberg,* unreported, No. 751, September Term, 1979, decided May 8, 1980. The Court granted certiorari.

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Alan R. Engel* and *Robert Allen Sapero,* with whom were *Sapero & Sapero* on the brief, for appellants.

*M. King Hill, Jr.,* with whom were *John J. Boyd, Jr.,* and *Smith, Somerville & Case* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court.

This is a motor vehicle tort case filed by a minor and her father. Judgment in favor of the plaintiffs, based upon a jury verdict, was reversed by the Court of Special Appeals. Because we conclude that the issues relating to negligent entrustment and assumption of the risk were properly submitted to the jury, we shall reverse.

The accident, which occurred on December 18, 1971, involved a single car. Lynn Kahlenberg (Plaintiff), then age 19, was a passenger. Lawrence Saul Goldstein (Lawrence), then age 20, was driving.[1] Lawrence is the son of Bernard M.

---

1. The "age of majority" was not reduced to 18 years until July 1, 1973 by Chapter 651 of the Acts of that year.

Goldstein (Bernard), a member of the Bar of this Court whose practice concentrates on negligence and compensation matters. Bernard was sued on the theory that he was negligent in supplying the vehicle to his son and as the parent who had signed the application for Lawrence's most recent, but then expired, Maryland operator's license.[2] Both Bernard and Lawrence, through their respective counsel, in 1975 obtained an order severing trial of the claim against Bernard from the trial of the claim against Lawrence, thereby avoiding the prejudice before the jury to Lawrence of having his driving record put into evidence for purposes of the claim against Bernard. Trial in August 1976 of the claim against Lawrence resulted in a hung jury. Upon retrial in February 1978 the verdict was against Lawrence for $100,000. At the trial of the claim against Bernard in April 1979, two issues were submitted to the jury. The first, whether Bernard negligently entrusted the motor vehicle to Lawrence, was answered "yes." The response to the second issue, whether the Plaintiff assumed the risk of riding in a car driven by Lawrence, was "No." [3] Bernard appealed to the Court of Special Appeals.[4] That court reversed, without a

---

**2.** At the time of the accident Lawrence possessed a valid California operator's license.

A directed verdict was granted in favor of Bernard as to his alleged liability under Md. Code (1957, 1970 Repl. Vol.), Art. 66 ½, § 6-107. In the view which we take of the case, it is unnecessary to review this ruling.

**3.** The docket entries of April 6, 1979 reflect a verdict of the jury in favor of the Plaintiff and her father against Bernard "for costs" and judgment nisi on that verdict. Judgment absolute was entered April 25, 1979. Prior to the start of the trial against Bernard he obtained a ruling from the court excluding any mention of the amount of the verdict against Lawrence in the prior trial and excluding any reference to the Plaintiff's injuries. Counsel for Bernard suggested that the jury be informed of the amount of the verdict rendered against Lawrence only in the event that they find in favor of the Plaintiff and that "then the Court can instruct them how the verdict can be entered, because they have no discretion [as] to the amount." The trial court adopted that suggestion at the time, but subsequently determined to submit a special verdict to the jury. The special verdict was rendered late in the day on a Friday, after which the jurors were excused and at which time the court announced it would prepare a judgment in writing the following week. No such written judgment appears in the record. Inasmuch as damages of $100,000 were in effect stipulated, it is suggested that the Plaintiff and her father, after the mandate on this appeal, apply to the Circuit Court for Baltimore County under Rule 625 to correct the mistake.

**4.** The Plaintiff noted a cross-appeal because of the directed verdict in favor of Bernard on the statutory pledge theory. We need not decide the issues of appellate procedure which the filing of that cross-appeal provoked.

new trial, on the ground that the Plaintiff was guilty of assumption of the risk as a matter of law. (*Goldstein v. Kahlenberg,* unreported, No. 751, Sept. Term, 1979, decided May 8, 1980). We granted certiorari.

Cars were very important in Lawrence's life. He received his first driver's license on April 24, 1967 at age 16. The Maryland driving record which Lawrence subsequently compiled up to the date of the subject accident was introduced through a witness from the Motor Vehicle Administration and is set forth in the margin.[5] From July 14, 1967 through

---

5. These exhibits included a summary printout and copies of traffic summonses. The witness was not asked to explain each entry in the summary, some of which contain abbreviations for which no code explanation was placed in evidence. However, from the exhibits submitted to it, the jury could reconstruct, in chronological order, the following:

| Date | Offense | Disposition | |
|------|---------|-------------|---|
| 7-03-67 | Inadequate muffler | $10 | |
| 7-14-67 | Exceeding speed limit by 10 mph (92 mph in 60 zone) | $50 | 3 pts. |
| 9-01-67 | Improper turn — U-turn within 100 feet of intersection | $10 | 1 pt. |
| 11-17-67 | Hearing — suspension held in abeyance pending attendance at driver's clinic; 1 year probation. | | |
| 11-22-67 | Operating vehicle in improper manner — spinning wheels | $25 | 1 pt. |
| 11-25-67 | Failure to obey automatic signal | $10 | 1 pt. |
| 12-05-67 | Exceeding speed limit by 10 mph (exceeding 70) | $35 | 3 pts. |
| 12-05-67 | Failure to have registration card in possession | $5 | |
| 12-11-67 | Failure to obey written citation | Sentence suspended | |
| 12-13-67 | Speeding | $15 | 1 pt. |
| 12-20-67 | Reckless driving | $15 | 3 pts. |
| 1-16-68 | Investigation to secure license | | |
| 2-13-68 | Pt. system notice of suspension mailed | | |
| 2-15-68 | Hearing scheduled | | |
| 2-20-68 | Failure to attend driver's clinic | Suspended 30 days | |
| 2-27-68 | License suspended as of 3/20/68 for 30 days for accumulation of 8 points | | |
| 3-02-68 | Exceeding speed limit by 10 mph (60-70 in 40 mile zone) | $25 | 3 pts. |
| 3-02-68 | Crossing center line | $10 | |
| 3-20-68 | Suspension withdrawn — withdrawn for entry of violations of Nov. 22 and Dec. 11 and 20, 1967 | | |
| 4-11-68 | Suspension letter for accumulation of 11 points mailed | | |
| 4-18-68 | Point system suspension withdrawn | | |

April 22, 1968 Lawrence had accumulated ten moving violations which resulted in the revocation of his license. On September 3, 1968 and June 19, 1969 Bernard endorsed applications by Lawrence for reinstatement of driving privileges in which Bernard certified that he was "fully aware as to why [Lawrence's] driving privilege was revoked . . . ." Lawrence's license was reinstated April 23, 1970 after completion of a driver's clinic.

Lawrence had moved out of the family home in Lutherville for three or four months when he was 15 and lived at various unspecified locations. He left home again at age 16 and lived in downtown Baltimore before returning to the Goldstein home. In September 1968 he went to California and lived for a time with his sister. Lawrence was married on June 18, 1970 and moved with his wife to California. There he attended college for a time, but dropped out and went to mechanic's school for a few months. He had no steady job. His wife worked and his wife's parents subsidized the couple in California so that he could stay in school. From time to time the Goldsteins sent Lawrence money. Lawrence obtained a California driver's license.[6] There was no evidence that he had any California motor vehicle violations. He successively owned three different automobiles while in California, as well as a motorcycle. On

| 4-22-68 | Reckless driving — involved in an accident | $25 | 3 pts. |
| 5-17-68 | Revocation notice mailed | | |
| 5-17-68 | License revoked as of 4/18/68 for 90 days for accumulation of 12 points | | |
| 10-08-68 | | Reinstatement denied | |
| 2-05-69 | | Reinstatement denied | |
| 7-08-69 | | Reinstatement denied | |
| 3-17-70 | | Completed driver's clinic | |
| 4-23-70 | | Reinstated | |
| 6-02-70 | Stop sign, § 242 | | 1 pt. |
| 6-20-70 | Unreasonable speed | | 1 pt. |
| 11-03-70 | Improper passing | $10 | 1 pt. |
| 9-15-71 | Failure to obey automatic signal | | 1 pt. |
| 12-18-71 | Improper tags — involved in accident | | |

6. In obtaining the California license, Lawrence denied that he had ever had his driving privilege revoked. On cross-examination he characterized this as "perjury."

about three occasions prior to October of 1971 he returned to Baltimore for visits. Four violations on his Maryland record, involving occasions in June and November of 1970 and in September of 1971, occurred after reinstatement. Lawrence testified he did not tell Bernard about these traffic summonses which Lawrence simply ignored because he felt that, as a California resident, they could not be enforced against him. Bernard denied knowledge of these 1970 and 1971 violations.

Lawrence and his wife were having marital difficulties. In October 1971 Lawrence returned to the Goldstein home. He left his Dodge automobile in California. There were two automobiles at that time in the Goldstein family. One, an Oldsmobile, was used by Bernard almost exclusively. Mrs. Goldstein drove a station wagon. Lawrence was driving every day during this period, apparently using the station wagon. He was unemployed until the first week in December, but from time to time he was given money by his parents. The job he obtained was as an assistant mechanic's helper at Tunex Diagnostic Center for which he was initially paid $20 per week in cash. Lawrence subsequently learned that his mother had made an arrangement with the proprietor of the diagnostic center under which she paid the employer a portion of the monies being paid for Lawrence's services.

Lynn Kahlenberg, the Plaintiff, had known Lawrence and Mr. and Mrs. Goldstein for five to ten years prior to the accident. She was part of a group of young people with whom Lawrence associated. Miss Kahlenberg was a frequent visitor to the Goldstein home and went out regularly with Lawrence prior to his marriage. When Lawrence returned from California in October of 1971 she resumed seeing him regularly, even though her father was opposed to her association with Lawrence, whom Lynn's father considered to be a bad influence and a dangerous driver. She had been with Lawrence when he received some of his tickets for traffic violations and had been with him when he had a couple of minor accidents which did not involve any personal injury.

The vehicle which Lawrence was driving at the time of the December 18, 1971 accident was a 1963 Ford with a police interceptor engine which had been purchased for $75 on Sunday, December 12, 1971. Lawrence saw the car advertised in the newspaper and he, Bernard and the Plaintiff drove that Sunday to the home of Luther Hedrick in Pasadena, Maryland where the purchase was made. Both Lawrence and Bernard testified that Lawrence purchased the car with Lawrence's own funds. Lawrence said that he brought back to Baltimore money which he had obtained from the sale of an automobile in California. Bernard said he drove Lawrence to Pasadena because Lawrence did not know how to find the Hedrick address and because he was curious about what kind of a car could be purchased for $75. This evidence, if believed, would mean that Bernard did not supply Lawrence with the car involved in the accident. However, there was evidence to the contrary. The Plaintiff testified that Mr. and Mrs. Goldstein wished to give Lawrence a car as a Chanukah present and that Bernard paid Hedrick $75 in cash for the car. The deposition testimony of Hedrick, who had died in July 1975, was that Bernard paid for the car and told Hedrick that he, Bernard, was buying it, although eventually it was for his son. Lawrence said that he obtained the title and registration from Hedrick, as well as a receipt for $75 made out from Hedrick to Lawrence. The title, or registration certificate, of Hedrick, bearing his assignment to the purchaser, was not produced in evidence. On deposition, Hedrick was shown a receipt, but he denied that it bore his signature. It is undisputed that Lawrence, using Hedrick's tags, drove off with the Ford that Sunday. Lawrence worked on the car so that it could pass inspection, which it did on December 15. The accident occurred on Saturday, December 18 and Lawrence testified it had been his intention to register the car in his name the following Monday.

## I

Bernard argues that he was entitled to a directed verdict as to primary negligence because the evidence was legally

insufficient to support a finding (1) that he supplied the vehicle, or (2) that he had the power to permit or prohibit the use of the vehicle by Lawrence, or (3) that negligence, if any, on his part was a proximate cause of the Plaintiff's injury.

This Court first applied the theory of negligent entrustment as expressed in Restatement of Torts § 260 (Tent. Draft No. 5, 1930), in *Rounds v. Phillips,* 166 Md. 151, 170 A. 532 (1934). As expressed in Restatement (Second) of Torts § 390 (1965) the rule is that

> [o]ne who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

The Restatement formulation of the rule has been approved in the second *Rounds* case, *Rounds v. Phillips,* 168 Md. 120, 177 A. 174 (1935); *Houlihan v. McCall,* 197 Md. 130, 138, 78 A.2d 661, 665 (1951); *Snowhite v. State ex rel. Tennant,* 243 Md. 291, 311-12, 221 A.2d 342, 353-54 (1966); *Curley v. General Valet Service, Inc.,* 270 Md. 248, 255, 311 A.2d 231, 235 (1973); and in *Morrell v. Williams,* 279 Md. 497, 503, 366 A.2d 1040, 1043 (1976). *See also U-Haul Co. v. Rutherford,* 10 Md. App. 373, 375-76, 270 A.2d 490, 491-92 (1970).

In this case the evidence most favorable to the Plaintiff is that Bernard purchased the automobile as a gift for Lawrence. Bernard contends, however, that the law in other states does not impose negligent entrustment liability on one who makes the gift of an automobile to an incompetent driver and cites *Shipp v. Davis,* 25 Ala. App. 104, 141 So. 366 (1932); *Estes v. Gibson,* 257 S.W.2d 604 (Ky. 1953); and *Brown v. Harkleroad,* 39 Tenn. App. 657, 287 S.W.2d 92 (1955).

In *Shipp* a father gave a Buick to his adult son knowing that the son would take it with him to the University of

Alabama where he was a student. A judgment against the father based on negligent entrustment was reversed on the following analysis:

[I]f it should be held that an automobile could not, without assuming liability for negligent or incompetent driving, be sold or given to a person not having sufficient knowledge or training to drive the car, it would be carrying the doctrine of concurrent liability far beyond any decision coming to our knowledge. Whether by a gift or a sale when an automobile is placed in the possession and control of a person, sui juris, such transfer passes the title to the buyer or donee, and thereafter responsibility for its operation rests with such buyer or donee. If, however, at the time of delivery of possession and control, the receiving party was by reason of intoxication or other cause incapacitated from driving the machine with reasonable safety to the public, a different rule would apply.

... [The father] never had possession of the car, and exercised no control or dominion over it. The defendant [son] was over twenty-one years of age, and had by virtue of his age passed from the legal control of his parents. There can be no doubt from the evidence in this case that the car was the property of defendant [son] and that the defendant [father] had no interest in or control over it. But, whether the defendant [father] was the owner of the car or not, he was not at the time of the accident present or in control of the car, and the fact, even if proven, that [the father] knew at the time [the son] obtained possession of the car that [the son] "drank," would not impart actionable negligence to [the father]. [25 Ala. App. at 106-07, 141 So. at 367.]

*Estes v. Gibson, supra,* was a four-three decision of the highest court of Kentucky which sustained the dismissal on demurrer of a claim against a mother who had purchased an automobile for her adult son who was known by her to be an

inebriate and drug addict. The majority referred to the two *Rounds* decisions of this Court but said that the case before it was different because the "alleged unfit and negligent driver of the car was the sui juris owner," so that the relationship of parent and child was incidental. 257 S.W.2d at 606. The opinion of the court accepted the reasoning of the *Shipp* case as a reasonable conclusion. The dissent in *Estes* could see no reasonable basis for a distinction between a bailment and a gift to a known reckless driver and suggested that one who gives an automobile to a known incompetent is more negligent than one who merely lends the vehicle on a specific occasion because the donor places in the incompetent the power to use the vehicle at any and all times.

*Brown v. Harkleroad, supra,* reversed a judgment based on negligent entrustment which had been entered against a father who purchased an automobile for his 26-year-old son upon the latter's return from two years service in the Army. It relied on *Shipp* and on *Estes* and asked these rhetorical questions:

> If a father incurs liability by giving an automo-
> bile to his son, knowing him to be a drunken or
> incompetent driver, when would it end? Would it
> last for the life of the automobile? Would it apply to
> a new automobile in the event of a trade-in? Or
> would liability attach to a dealer who sold an auto-
> mobile to a known incompetent or drunken driver?
> Or to a filling station operator who sold such a per-
> son gas, knowing of his propensity? [39 Tenn. App.
> at 665, 287 S.W.2d at 96.]

A different result has been reached by the appellate division of the Supreme Court of New York in an appeal from a dismissal for failure to plead a cause of action. *Golembe v. Blumberg,* 262 App. Div. 759, 27 N.Y.S.2d 692 (1941) (per curiam) upheld the sufficiency of a complaint which alleged the purchase by a father of an automobile for his adult son, a known epileptic, who suffered an epileptic seizure while driving, and thereby caused injury to his passengers. *Bugle*

*v. McMahon,* 265 App. Div. 830, 37 N.Y.S.2d 540 (1942) (per curiam) held a complaint to be insufficient which failed to allege any causal connection between the accident and conduct on the part of the father who had purchased an automobile for his son.

We do not entirely accept the reasoning of those decisions which broadly decline to apply the negligent entrustment theory where the chattel is supplied by gift. Somewhat anomalously, two of them recognize the applicability of the doctrine where the chattel is supplied by some form of bailment. *Estes v. Gibson, supra,* 257 S.W.2d at 605; *Brown v. Harkleroad, supra,* 39 Tenn. App. at 660-61, 287 S.W.2d at 94. It seems to us that the principal features of the tort lie in the knowledge of the supplier concerning the dangerous propensities of the entrustee and in the foreseeability of harm. If one who gives an automobile to a member of his immediate family has the requisite knowledge, and the other elements of the tort are satisfied, we can see no reason for denying liability exclusively on the basis that title is transferred in addition to possession. Professor Prosser, referring to the decisions relied upon here by Bernard, states that they "look definitely wrong" and we agree. W. Prosser, *Handbook of the Law of Torts* § 104, at 678-79 (4th ed. 1971). *See* 2 F. Harper and F. James, *The Law of Torts* § 28.2, at 1536 and n.2 (1956). Liability is not based upon continued ownership, but upon the negligent entrustment when it operates as a concurrent cause with the negligence of the entrustee. See Notes at 33 B.U.L. Rev. 538 (1953); 32 Chi.-Kent L. Rev. 237 (1954) and 43 Ky. L.J. 178 (1954).

One reed upon which *Estes v. Gibson, supra,* rested was that the illustrations to § 390 of the Restatement of Torts (1934) were "confined to cases of agency and bailment . . . ." 257 S.W.2d at 605. Restatement (Second) of Torts § 390 (1965) in Comment *a* now clearly takes the position that the rule includes donors of a chattel for the use of another. The current Restatement also furnishes as illustration 6 an example which includes the gift of an automobile to a known epileptic. The illustration is obviously patterned on *Golembe v. Blumberg, supra,* and demonstrates that the American

Law Institute prefers that analysis over the analysis in the line of cases relied upon by Bernard.

Our reference to Comment *a* and to illustration 6 of § 390 of the Restatement, because of their inclusion of entrustment by way of gift, is not an indication that we embrace the applicability of § 390 liability to any of the other modes of supply referred to therein. The holding in this case goes no further than to recognize that the principle expressed in § 390 applies where a gift of an automobile is made to a member of the donor's immediate family. Inasmuch as there was legally sufficient evidence from which the jury in the instant matter could find that Bernard gave the car to Lawrence, as opposed to Lawrence purchasing it independently, Bernard was not entitled to a directed verdict on the ground that he did not supply the car to Lawrence.

Bernard next contends, utilizing the above-quoted language from the *Rounds* decisions, that there was no legally sufficient evidence that he had the right to permit and the power to prohibit Lawrence's use of the Ford police interceptor.[7] Inasmuch as certain donors can be suppliers within the meaning of the rule, and since a donor would ordinarily relinquish any right to permit and power to prohibit the use of the chattel upon its delivery to the donee and consummation of the gift, the right to permit and the power to prohibit the use of the chattel, after the transfer and at the time of the injury, would not ordinarily be a *sine qua non* of liability. The reason is that the tort of negligent entrustment involves concurrent causation. The negligence of the supplier consists of furnishing the chattel with the requisite knowledge. This sets in motion one chain of causation which may or may not in fact result in injury. The other chain of causation involves the conduct of the immediate tortfeasor. If physical harm results to one within the class of foreseeable plaintiffs, as a result of the use of the chattel by the entrustee in a manner, which, because of the

---

7. The trial court in this case did not instruct that "the right to permit and the power to prohibit" are elements of the tort and Bernard makes no contention in this Court that this constituted error.

youth, inexperience or otherwise of the entrustee, the supplier knew or had reason to know was a likely use and which would involve an unreasonable risk of physical harm, the two chains of causation converge and liability is imposed on the supplier, for his own negligence. It is within the framework of this analysis that the "right to permit and the power to prohibit" language of the *Rounds* cases is used.

The first *Rounds* case was an appeal from a judgment for the defendants entered on demurrer to the declaration. It was alleged that the son of the defendant parents had obtained his driver's license at age 16. He had one speeding conviction at age 17 and a reckless driving conviction at age 19. A week thereafter the father purchased a Buick automobile which he had registered in the son's name and which the son used whenever he desired. No attention was directed in the *Rounds* litigation to whether initially supplying the car to the son constituted a negligent entrustment because there was no contention that, as of that time, the father knew or had reason to know of facts which would make it negligent for him to furnish the car. Three months thereafter the son was convicted of driving under the influence and his operator's license was revoked. During the period of revocation the son transferred title to the Buick to his mother. The license was reinstated about a month before the son's twentieth birthday and about four and one-half months after his twentieth birthday the fatal accident occurred which gave rise to the litigation. The plaintiff's contention was that the conviction for driving while intoxicated, and other facts known to the parents, furnished the requisite knowledge for application of the negligent entrustment theory to the use of the car by the son at the time of the accident. One specific contention of the father was that the car was titled in, and owned by, the mother so that, in effect, it was not he who supplied the chattel. In response we said:

> Under the facts of this case, that, in our opinion, does not create a valid distinction. The son was a minor, and the father, as the controlling head of the family, had the authority and power to permit the

use by the son of the mother's automobile, or to prohibit it. [166 Md. at 167, 170 A. at 538.]

And further:

> We do not think that the title to the automobile, as shown by the records of the automobile commissioner of the state, is conclusive, but that the principle applies not only to the owner of an automobile, but to anyone who has the right to permit and the power to prohibit the use thereof. Having such power and authority, if he does not prohibit his minor son, who he knows is addicted to driving an automobile while under the influence of liquor, and is habitually negligent and reckless in its use, there can be no valid distinction between him, under such circumstances, and the one who has the record title to the automobile in question. [Id. at 168, 170 A. at 538.] .

The above-quoted discussion was in the context of whether the father could be a supplier of the car at a time when the father could be found to have the requisite knowledge for negligent entrustment. Although he may not have directly furnished the car to his son after the son's license was reinstated, and although the father may not have been the owner of the automobile, his right to permit and power to prohibit the use of the vehicle effectively made him a supplier at that time. In the instant matter there was sufficient evidence from which the jury could find that Bernard supplied the Ford police interceptor to Lawrence by gift on December 12, 1971 and that, at the time Bernard supplied the chattel, he had the requisite knowledge of Lawrence's propensities so as to have then set in motion the entrustor's chain of causation. Under the facts of this case the Plaintiff was not required to go further and demonstrate that Bernard retained, and should have exercised, a power to prohibit any use by Lawrence of the completed gift.

The proximate cause contention of Bernard has two aspects. First it is said Lawrence would have obtained the car in any event and, secondly, that the Plaintiff failed to

prove that the December 18, 1971 accident was caused by the type of risk creating conduct of Lawrence which Bernard knew or had reason to know would be likely. The first aspect of the argument rests on testimony of Lawrence to the effect that he had funds on December 12, 1971 with which to buy the car. He said the source of the funds was about $1,500 which he brought in October from California and which were the balance remaining from the sale of a car there sometime earlier. Lawrence further testified that if his father had not driven him to the seller's home in Pasadena,[8] Lawrence would have used Lynn Kahlenberg's car to go there and purchase the Ford police interceptor in any event. However, the jury need not have credited Lawrence's testimony. There was also evidence that Lawrence had no regular employment during his stay in California, that he lived there on his wife's earnings and on monies furnished by his wife's parents and by his parents, and that his California bank account was once closed for overdrafts. The automobile which he owned immediately prior to leaving California was left there. He had no regular employment in Baltimore until December and then at only $20 per week. There was testimony from the Plaintiff that Lawrence asked Bernard for money several times a week and that that was the source of funds which Lawrence used if she and Lawrence went out socially. We think the inevitability of the purchase of the car by Lawrence, independently of Bernard, was properly a jury question.

On the second aspect of Bernard's proximate cause contention, it is true that the Plaintiff, in the trial of the claim against Bernard, did not produce proof of the precise act or omission on the part of Lawrence which negligently caused the accident. This was because the trial court on September 19, 1975, in granting the severance, stated that the colloquy in connection with that order would be written up and filed "as a binding commitment on the part of [Bernard]." That colloquy included a statement by Bernard's counsel that

---

**8.** Under Lawrence's testimony, Bernard went to Pasadena, not to buy the car, but to show the way and out of curiosity.

Bernard "will be bound by the verdict" in Lawrence's case. The jurors at the trial of the claim against Bernard were preliminarily told by the court, and told in opening statement by the Plaintiff's counsel, that there had been an accident in 1971 involving a vehicle driven by Lawrence which went off the road into a utility pole resulting in injury to the Plaintiff. Counsel for Bernard told the jury in opening statement that Lynn Kahlenberg had already obtained a verdict and judgment against Lawrence.

At argument in this Court, Bernard says that the statement concerning being bound by the verdict against Lawrence referred to the law of collateral estoppel. As we see it, the trial was bifurcated at the request of the defendants and for their benefit. At the severance hearing the court requested counsel for the defendants to prepare a written stipulation but Bernard's counsel stated that a write up of the colloquy with the court would be acceptable to Bernard. Under these circumstances we do not propose to construe the commitment narrowly in favor of Bernard. Rather, we see it as meaning that the Plaintiff need not prove over again in the trial involving Bernard those matters which had already been established in the trial against Lawrence. We read the opening statements of counsel at the trial involving Bernard as supporting this interpretation. This is not a case in which the negligence in entrustment was predicated on the entrustee's epilepsy or addiction to drugs or abusive use of alcohol, so that it would be necessary for a plaintiff to demonstrate that the characteristic of the entrustee, relied upon to establish negligent entrustment, was the particular characteristic which caused the accident. Here the theory of the Plaintiff's case, supported by sufficient evidence, was that Bernard knew or had reason to know that Lawrence was likely to drive in a negligent and reckless manner. The admission by counsel for Bernard in his opening statement that the Plaintiff had already obtained a verdict against Lawrence necessarily meant that Lawrence had been found to have driven negligently at the time of the accident. Under the commitment between court and counsel made at the

time of bifurcation, the admission was sufficient to avoid the necessity of any further proof.

## II

The Court of Special Appeals held that Bernard should have been granted a directed verdict on the ground of the Plaintiff's assumption of the risk.[9] Bernard points out that on the evening of the accident the Plaintiff drove her own car to the Goldstein home where she met Lawrence. They left in the Ford police interceptor with Lawrence driving. Bernard argues that the Plaintiff's knowledge of Lawrence's driving propensities was equal or superior to his own, and that she voluntarily assumed the risk of her own injury as a matter of law, particularly when she had an alternate means of transportation available.

The Plaintiff established Bernard's knowledge of the risk to others involved in Lawrence's driving by producing records containing Bernard's written certifications on Lawrence's applications for reinstatement. From these the jury could find that Bernard knew of each of Lawrence's pre-revocation violations. The proof did not proceed the same way as to the Plaintiff's knowledge. Understandably, no effort was made at the trial in 1979 to elicit admissions based on the memory of the Plaintiff that, prior to December 1971, she knew of each of the moving violations charged to Lawrence in 1967 and 1968, when the Plaintiff was 14 and 15 years old. As a consequence of the difference in the evidence relating to specific knowledge, the jury need not have found that the Plaintiff's knowledge equaled that of Bernard, and thus could find Bernard to be negligent while finding the Plaintiff not to have assumed the risk. "[T]he doctrine of assumption of the risk will not be applied [as a matter of law] unless the undisputed evidence and all permissible infer-

---

9. No question has been raised by the Plaintiff whether assumption of the risk applies to a claim of negligent entrustment. We shall assume, solely *arguendo,* that it does. Nor does the Plaintiff make any contention in this Court that Bernard's stipulation to be bound by the verdict in Lawrence's case precluded Bernard from asserting an assumption of the risk defense.

ences therefrom *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff." *Kasten Construction Co. v. Evans,* 260 Md. 536, 544, 273 A.2d 90, 94 (1971) (emphasis in text).

Bernard's assumption of the risk argument is predicated almost exclusively on the descriptions or characterizations of the manner in which Lawrence drove in late 1971 which were given by the Plaintiff on cross-examination, and the substance of which we quote in the margin.[10]

---

10. Q. All right. Now, during this period between September, October and December of 1971, were there any other occasions prior to December 12, 1971 when Mr. Bernard Goldstein, Lawrence Goldstein and yourself drove in the same car?

A. Yes, there were.
Q. All right. Was anyone else present?
A. His mother was also present.
Q. And where did you go? Where were you going?
A. We were going to New York for the day.
Q. And who drove?
A. Mr. Goldstein and Lawrence alternated.
. . .
Q. How did [Lawrence] drive in the presence of his father?
A. He drove the same way he always drove. He drove fast, he was zipping in and out of traffic.
. . .
Q. Did your father consider [Lawrence] a dangerous driver?
A. I believe he did.
. . .
Q. Now, after this automobile was purchased in early December of 1971, you drove from the Hedrick home with Lawrence to Baltimore, is that correct?
A. That is true.
Q. And how did Lawrence drive at that time?
A. He drove fast.
Q. Pardon?
A. He drove fast. He always — the way he always drove.
. . .
Q. Well, what was your knowledge, Miss Kahlenberg, of how Lawrence drove a car?
A. He drove fast. I always thought he was a good driver because he handled the car well.
Q. Well, again, referring to a deposition, Miss Kahlenberg . . . "Question: Was he a good driver?" You answered "No." Is it a fact that you did not consider Lawrence to be a good driver?
A. I said he drove fast, he drove reckless, but he always handled the car.

The Plaintiff said that Lawrence drove fast, recklessly and the way he wanted to. At one point she referred to a more specific standard when she said he exceeded "the speed limit." The number of miles per hour over the speed limit, how frequently, and under what circumstances this occurred was not developed. It is to be noted that the Plaintiff "always thought [Lawrence] was a good driver because he handled the car well." She did not expressly adopt as her own the characterization in counsel's questions that Lawrence was a "dangerous driver." The Plaintiff also said that when Lawrence was driving with his parents in the car on trips out of state, he "drove the same way he always drove. He drove fast, he was zipping in and out of traffic."

Bernard described these trips differently.

Q. On the occasion, Mr. Goldstein, when Lawrence is driving your car with you, did you notice

---

Q. Isn't it a fact that you testified in 1975, that as of 1971, your knowledge was that Lawrence drove fast, he always drove crazy, he just did whatever he wanted to do, and he had a number of accidents?

A. I believe that is right.

Q. You knew all of that in 1971, did you not, Miss Kahlenberg?

A. Yes, I did.

. . .

Q. Now, isn't it also true, Miss Kahlenberg, that as of 1971 . . . you had been present in the car with Lawrence . . . on occasions when you considered that he was driving recklessly and at a high rate of speed?

A. Yes. There were occasions.

Q. And isn't it a fact, Miss Kahlenberg, that as far as you considered Lawrence's driving ability in 1971, you thought that he was a dangerous and reckless driver?

A. I said that he drove reckless, he drove fast. He exceeded the speed limit.

Q. And you thought that he was a dangerous driver?

A. If that is the word I used.

. . .

Q. Now, isn't it a fact that in 1971, you considered Lawrence a reckless and dangerous driver?

A. I knew that Lawrence drove fast, he drove reckless, he drove the way he wanted to regardless of, you know —

Q. And you have heard the testimony in court today and yesterday. Isn't it a fact, Miss Kahlenberg, that you knew exactly what kind of driver Lawrence was in 1971?

A. I knew what kind of driver he was.

> anything about the manner in which Lawrence operated the car while you were a passenger in the car?
>
> A. I didn't notice anything that unusual about it. I certainly, with my wife in the car and myself, I would not have tolerated any wrong driving.
>
> Q. Such as the conduct you have heard Lynn describe?
>
> A. It was just normal driving while I was in the car.

Referring to the same trips Lawrence said: "Well, I drove a little differently usually with, you know, adults in the car, than I would otherwise."

The differences in the Plaintiff's characterization of the way Lawrence "always" drove, both within the Plaintiff's own testimony and by comparison to the description given by other witnesses of Lawrence's driving on particular occasions which were also described by the Plaintiff, created a factual question for the jury to resolve on the issue of the Plaintiff's assumption of the risk.

### III

The final point which Bernard makes is that the trial court was required to submit a third special interrogatory to the jury which would have focused on the issue of proximate cause. Bernard also argues that the instructions on proximate cause which he requested should have been embodied in the charge to the jury. We note that the trial court charged that the "plaintiff has the burden of proving by a preponderance of the evidence that the defendant's negligence, that is, Bernard Goldstein's negligence, was a cause of her injury," and further that "to recover . . . the negligence must be a cause of the injury." The court further charged almost verbatim from § 390 of the Restatement, including the element of "resulting" physical harm. The instructions as given in no way limited the summation by Bernard's counsel. He argued, as being within the trial judge's charge, substantially the same proximate cause contentions which were embraced within Bernard's more detailed requested

instructions and which are argued here as having required a directed verdict.[11] We see no prejudicial error relating to instructions or in the denial of the requested additional special interrogatory.

> *Judgment of the Court of Special Appeals vacated.*
>
> *Case remanded to that court with instructions to affirm the judgment of the Circuit Court for Baltimore County without prejudice to subsequent correction by the Circuit Court for Baltimore County consistent with this opinion.*
>
> *Costs to be paid by Bernard M. Goldstein.*

---

**11.** Final argument on behalf of Bernard included the following:

[T]his was not a vehicle which Mr. Goldstein supplied to Lawrence, but was, in fact, Lawrence's vehicle at all times, and one which Mr. Goldstein had no opportunity or right to control since it was in Lawrence's control who was then twenty years, nine months of age.

Now, with regard to whether there was proximate cause, the term Judge Haile used to you. Whether the so-called entrustment of this car was really the cause of this accident . . . . [Lawrence] would have had Lynn take him down, and he would have bought the very same car. And I suggest to you that that evidence very clearly shows that whatever Mr. Goldstein did was not the proximate cause, as Judge Haile has given it to you. . . .

And further:

"[Bernard's] conduct, in the language of Judge Haile, was not the real cause of what happened."