624 A.2d 1285

### FIGGIE INTERNATIONAL, INC., SNORKEL–ECONOMY DIVISION

v.

### Virginia TOGNOCCHI, individually, etc.

No. 857, Sept. Term, 1992.

Court of Special Appeals of Maryland.

May 27, 1993.

230

Robert E. Powell (Catherine A. Potthast and Smith, Somerville & Case, on the brief), Baltimore, for appellant.

Daniel M. Clements (Paul D. Bekman and Israelson, Salsbury, Clements & Bekman, on the brief), Baltimore, for appellees.

William T. Wood of Rockville, for amicus curiae, Maryland Trial Lawyers' Ass'n.

Mark D. Gately, J. Mark Coulson, Donna B. Preston and Miles & Stockbridge of Baltimore, for amicus curiae, Maryland Ass'n of Defense Trial Counsel.

David M. Funk, Richard A. Froehlinger, III and Shapiro and Olander of Baltimore (Stephen P. Carney, Hunt Valley, Gen. Counsel, of counsel), for amicus curiae, Medical Mut. Liability Ins. Soc. of Maryland.

Argued before BISHOP, GARRITY, ALPERT, BLOOM, WENNER, FISCHER and HARRELL, JJ.

FISCHER, Judge.

This case stems from the death of Ronald Tognocchi, a safety manager with AAI Corporation. Mr. Tognocchi was killed while operating a UNO–33E manlift manufactured by Figgie International, Inc., Snorkel–Economy Division (Snorkel). Following Mr. Tognocchi's death, his wife, Virginia Tognocchi, and his son, Scott C. Tognocchi, filed suit in the Circuit Court for Baltimore City against Snorkel and against the lessor of the manlift.[1] The complaint contained claims for wrongful death on behalf of Mrs. Tognocchi as surviving spouse and on behalf of the Tognocchi's son and their minor daughter, Dawn. The complaint also contained personal representative's survival claims on behalf of Mr. Tognocchi's estate.

The matter proceeded to trial before a jury, and at the end of the plaintiff's case, the court granted Snorkel's motion for judgment on the issue of punitive damages. At the conclusion of all the evidence, Snorkel argued that it was entitled to judgment since the uncontradicted evidence established, as a matter of law, that Mr. Tognocchi had assumed the risk of his injury. Snorkel also raised the issue of its duty to warn. The court denied Snorkel's motion, and submitted the case to the jury.

On October 18, 1991, the jury returned a special verdict in which it awarded damages for economic loss of $704,000 to Mrs. Tognocchi, $278,000 to her minor daughter, and $85,000 to her son. With regard to noneconomic damages, the jury

---

1. The lessor, Seims Rental and Sales Company, Inc., is not a party to this appeal.

awarded $675,000 to Mrs. Tognocchi and $650,000 to her daughter. Mrs. Tognocchi was also awarded $250,000 for loss of household services and $12,000 for counseling expenses. So, too, her daughter was awarded $8,000 for counseling expenses. On the survival claim, the jury awarded $125,000 to Mr. Tognocchi's estate for his pain and suffering. For Mr. Tognocchi's funeral expenses, the jury awarded $2,000.

Snorkel subsequently filed a motion for judgment notwithstanding the verdict and a motion to conform the verdict to § 11–108 of the Md.Cts. & Jud.Proc.Code Ann. On March 9, 1992, the court denied the motion for judgment notwithstanding the verdict and granted the motion to reduce the damages award in accord with § 11–108. On March 19, 1992, the court entered final judgment reducing Mrs. Tognocchi's award for noneconomic damages from $675,000 to $178,000 and similarly reducing Dawn's award for noneconomic damages from $650,-000 to $171,000.[2] The $125,000 awarded to the estate for Mr. Tognocchi's pain and suffering was unchanged. On April 9, 1992, Snorkel filed its appeal, and on April 13, 1992, the Tognocchis filed their cross-appeal.

Snorkel presents the following questions for us to decide:

1. Did Appellees' decedent assume the risk of injury, as a matter of law, when he, knowing that a prior operator of a manlift had been seriously injured, voluntarily drove the same manlift down the same slope, in the same configuration and in the same manner as the prior operator while attempting, before a video camera, to investigate or illustrate the prior accident?

2. Did the decedent's conduct, in using the manlift to ascertain or illustrate how the previous accident happened, constitute product misuse as a matter of law?

3. Did the manufacturer of the manlift owe [the] decedent a duty to warn him that the vehicle had a dangerous

---

2. The aggregate amount of noneconomic damages was reduced from $1,325,000 to $350,000, in keeping with the $350,000 cap established in § 11–108.

propensity, when he already knew that it had caused serious injury to a prior operator?

A. Did the trial judge err in refusing to grant the manufacturer's motions for judgment and j.n.o.v. as to its alleged failure to warn?

B. Did the trial judge err in refusing to instruct the jury that a manufacturer need not warn users of known dangers?

4. Did the trial judge err in admitting evidence of subsequent remedial measures taken by the manufacturer of a manlift for the purpose of establishing an alleged negligent failure to warn of a product defect and alleged manufacturer culpability, when the manufacturer did not contest feasibility?

The Tognocchis' cross-appeal presents several other questions for us to resolve:

1. Was Snorkel's Notice of Appeal filed more than thirty days after the entry of final judgment?

2. Did the legislature intend to exclude the cap from wrongful death actions?

3. Was the trial court correct in applying a separate cap to the claim by the estate as opposed to the wrongful death claimants?

4. Did the trial court err in applying an aggregate cap to Virginia and Dawn Tognocchi?

5. Does an aggregate cap violate the equal protection clause and right to trial by jury of the United States Constitution and Maryland Declaration of Rights?

6. Did the trial court err in refusing to submit the issue of punitive damages to the jury?

Central to the facts of this case is the UNO–33E manufactured by Snorkel. The UNO–33E is a "cherry-picker" type manlift that has a basket attached to the end of a boom, and the operator controls the machine while standing in the basket. The basket is located over a wheel base that rotates 180 degrees. This allows the operator to drive the manlift in the "forward" configuration, with the basket centered over the

drive wheels, or in the "reverse" configuration, with the basket centered over the steer wheels.

On June 19, 1989, AAI employee Roy Flaharty drove the lift, in the reverse configuration, down a slope. As he did so, the lift accelerated and then stopped suddenly. At that point, the rear wheels of the vehicle rose into the air and Flaharty was thrown upward and forward in the basket. Flaharty was seriously injured as a consequence.

AAI then assigned Mr. Tognocchi, its Assistant Safety Director, to investigate the Flaharty accident. Mr. Tognocchi was an engineer with more than twenty years of experience in industrial safety. During the course of the investigation, Mr. Tognocchi consulted with Gary Wampler, a representative of Snorkel. Wampler had come to AAI to test the unit that had been driven by Flaharty. On June 20, 1989, with Tognocchi and several others present, Wampler drove the unit up and down the slope in both the forward and reverse configurations without incident. It was then collectively decided that the Flaharty accident was the result of operator error.

Notwithstanding this conclusion, Tognocchi maintained the vehicle in a red-tagged status and did not allow it to be returned to service. On June 23, 1989, while in the presence of Alfred Young, in-house counsel for AAI, Mr. Tognocchi drove the manlift. Young videotaped the events as Mr. Tognocchi drove the manlift down the slope in the forward configuration and then in the reverse configuration. Mr. Tognocchi drove the lift in the reverse configuration only a short distance when the lift suddenly pitched forward. The rear wheels came several feet off the ground, and Mr. Tognocchi was catapulted against the controls. He died as a result of his injuries.

### I. Timeliness of Appeal

Preliminarily, the Tognocchis argue that Snorkel did not file its notice of appeal within thirty days of the entry of judgment. *See* Md.Rule 8–202. The Tognocchis contend that the memoranda filed by the court on March 9, 1992 constituted a final, appealable judgment. In order for a judgment to

be final and appealable, two criteria must be met: first, the judgment must settle the rights of the parties thereby concluding the cause of action, and second, the judgment must be entered on the docket. *Estep v. Georgetown Leather Design,* 320 Md. 277, 282, 577 A.2d 78 (1990). The docket sheet reflects that final judgment was entered on March 19, 1992. Snorkel's April 9, 1992 notice of appeal was, therefore, timely filed.

## II. Assumption of Risk

 Snorkel contends that Mr. Tognocchi was attempting to replicate the Flaharty accident, and in so doing, Mr. Tognocchi assumed the risk as a matter of law. To assume the risk, Mr. Tognocchi must have known and appreciated the risk and must have voluntarily chosen to encounter it. *Schroyer v. McNeal,* 323 Md. 275, 282, 592 A.2d 1119 (1991). The test of whether an individual knows of and appreciates the risk in a certain situation is an objective one and is a question that is usually to be resolved by the jury. *Schroyer,* 323 Md. at 283, 592 A.2d 1119. "[T]he doctrine of assumption of risk will not be applied unless the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of danger was *fully* known to and understood by the plaintiff." *Kasten Constr. Co. v. Evans,* 260 Md. 536, 544, 273 A.2d 90 (1971) (emphasis in original, citations omitted).

Despite Snorkel's assertions, it is far from clear that any risk of danger, much less this risk of danger, was known to and was voluntarily encountered by Mr. Tognocchi. Snorkel first contends that Mr. Tognocchi knew the circumstances of the Flaharty accident. The evidence on this point is not as definitive as Snorkel would like us to believe. Mr. Tognocchi was not present at the time of the Flaharty accident. Anything that he might have been told about the accident came from persons who may have observed the incident but who were ultimately forced to speculate about what precise actions Mr. Flaharty took or failed to take while he was alone in the operator's basket. Regardless of any such speculation, the consensus reached by Snorkel's representative and by Mr.

Tognocchi was that operator error caused the Flaharty accident.

This conclusion was reached after Snorkel's representative, Gary Wampler, drove the manlift in the reverse configuration down the same slope as Flaharty had driven it. After doing so, Wampler reported that the unit was safe, and the evidence shows that Mr. Tognocchi believed Wampler's assessment.

The unit was not immediately returned to service, however, pending additional testing by Mr. Tognocchi to further explore the idiosyncracies, if any, of this lift particularly with regard to braking. When driven down the slope subsequent to the Flaharty accident, the lift was observed to skid to a stop. Such skidding was not considered by anyone, including Snorkel, to be unacceptable.

On the day of the videotaping, Mr. Tognocchi drove the lift down the slope first in the forward configuration and then in the reverse configuration. Young testified that "there was never any impression in [his] mind at any time that Mr. Tognocchi intended to replicate the circumstances of the Flaharty accident." Rather, the purpose was to demonstrate how the equipment operated and to deduce how the Flaharty accident could have occurred if Mr. Tognocchi had operated the lift in the same manner as did Flaharty.

On his first "run" down the slope, Mr. Tognocchi drove the lift in the forward configuration, and some skidding occurred as he brought the machine to a stop. Mr. Tognocchi then rotated the lift to the reverse configuration. Before proceeding down the slope, it appears from the videotape that Mr. Tognocchi commented to Mr. Young, "I'm going to take it down the other way. I think we'll get some more impact. Okay ... I think this is the way it was." Mr. Tognocchi drove only a few feet when the lift stopped suddenly and pitched. He was thrown forward and upward into the control panel.

Snorkel points to Mr. Tognocchi's comment concerning "impact" as definitive proof that he intended to replicate the circumstances of the Flaharty accident and, therefore, assumed the risk of his injuries as a matter of law. We believe

that there are several inferences that may be drawn from Mr. Tognocchi's comment and that, in light of these multiple inferences, the issue of assumption of risk was a question for the jury to decide. It may be that Mr. Tognocchi used the word "impact" not in the sense of a forcible contact, but rather in the sense of producing greater demonstrative effect. Perhaps Mr. Tognocchi thought that by operating the lift in the reverse configuration, he could better capture on film any likelihood of the machine to skid and could subsequently use the film as a training guide to inform operators of the lift's characteristics.

While it is, of course, possible to infer that Mr. Tognocchi sought to replicate the circumstances of the Flaharty accident, such an inference seems, at best, implausible to us. Whatever he knew or did not know of the precise circumstances surrounding the Flaharty accident (including the pitching that occurred), Mr. Tognocchi was well aware that Flaharty sustained serious injury. It hardly seems likely that an engineer, with over twenty years of experience concerning industrial equipment and whose responsibility it was to ensure the safety of numerous employees, would have undertaken to replicate the circumstances of an accident that he knew resulted in serious injury. In addition, it would not have been possible for him to replicate the accident since no one knew what caused Flaharty's accident.

■ We offer our impression not as the correct or only inference that could have been drawn from the evidence, but to illustrate the point that the evidence was susceptible to more than one inference. In order to prevail on its contention that Mr. Tognocchi assumed the risk as a matter of law, Snorkel was required to prove that the " 'undisputed evidence and all permissible inferences therefrom *clearly* establish[ed] that the risk of danger was known to and *understood* by [Mr. Tognocchi].' " *Kahlenberg v. Goldstein,* 290 Md. 477, 494–495, 431 A.2d 76 (1981) (quoting *Kasten Construction Co.,* 260 Md. at 544, 273 A.2d 90). As we have decided that conflicting permissible inferences could have been drawn from the evi-

dence, it follows, then, that the question of assumption of risk was a question for the jury to resolve.

### III. Product Misuse

■ Snorkel next contends that Mr. Tognocchi's conduct in using the manlift to ascertain or to illustrate how the previous accident occurred constituted product misuse as a matter of law and should have served as a bar to recovery. Snorkel's argument is premised on the assumption that Mr. Tognocchi sought to replicate or did in fact replicate the circumstances surrounding the Flaharty accident. As discussed above, the evidence on this issue was not so compelling as to warrant a finding as a matter of law. The evidence, even though now couched in terms of product misuse, was still subject to various interpretations and, as such, created a question for the jury.

### IV. Duty to Warn

■ In its motions for judgment and for j.n.o.v., Snorkel argued, as it does on appeal, that "it owed no duty, as a matter of law, to warn Tognocchi of the propensity of the manlift to pitch, since the undisputed evidence at trial demonstrated that Tognocchi was aware of the hazard." Again, on this issue, the evidence is not as clear as Snorkel contends. While it is true that in Maryland there is no duty to warn someone of an obvious danger or of a danger of which he is already aware, *Banks v. Iron Hustler Corp.*, 59 Md.App. 408, 423, 475 A.2d 1243 (1984), it is equally true:

> Whether a particular danger is obvious or patent can depend on a number of things—the complexity of the machine, the knowledge, age, background, experience, intelligence, and training of the person injured, the extent to which his required contact with the device is routine and repetitive, whether he is subject to distractions, for example. It necessarily is a question of fact then, and, if there is any dispute about it, the question is for the jury to decide.

*Banks,* 59 Md.App. at 424, 475 A.2d 1243 (citations omitted, emphasis added).

Snorkel argues, "Because Tognocchi possessed actual knowledge of the propensity of the manlift to cause injury under the circumstances, Snorkel had no duty, as a matter of law, to warn him." If Mr. Tognocchi did possess actual knowledge of the propensity of the manlift to cause injury "under the circumstances," the question then becomes, under what circumstances? Under the circumstances of the Flaharty accident?

The Flaharty accident was the only other incident known to anyone at AAI in which a Snorkelift pitched. Wampler subsequently tested the same lift and pronounced it safe. As a result, the Flaharty accident was blamed on operator error. This, once again, returns us to the question of whether Mr. Tognocchi sought to recreate the circumstances of the Flaharty accident. We need not reiterate our analysis of the evidence on this issue, but we simply state that, for the reasons delineated above, this was a question for the jury to decide.

 Snorkel further argues that the trial court erroneously refused Snorkel's request for an instruction that it owed no duty to warn Mr. Tognocchi of known dangers. Among other things, the court instructed the jury:

[T]he manufacturer is not responsible for injuries caused by danger which is apparent to the user.

. . . . .

You are instructed there is no duty on a manufacturer to warn of open and obvious dangers associated with the use, operation or functioning of its products.

. . . . .

Now, where a dangerous condition is not obvious and is hidden, it should be disclosed to the user. Thus, if you find that the danger of the machine suddenly tipping or pitching forward is not one that is obvious to the operator of the machine, then the defendant manufacturer, Figgie, had a duty to warn the operator of the danger. However, if you find that the danger of the machine suddenly tipping or pitching forward is one that is obvious to the operator of the

machine, then the defendant manufacturer has no duty to warn the operator of that danger.

We conclude that the court did not err and that Snorkel's request was fairly covered by the instructions actually given. Maryland Rule 2-520.

## V. Subsequent Remedial Measures

After Mr. Tognocchi's accident, Snorkel issued a product safety bulletin that provided in pertinent part:

WHEN DRIVING WITH THE BOOMS NESTED, THE TURNTABLE MUST ALWAYS BE ROTATED SO THE STEERING WHEELS ARE IN THE FRONT OF THE UNIT WITH THE COUNTERWEIGHT ABOVE THESE WHEELS. The drive wheels should be at the rear of the unit nearest the platform. [Emphasis in original.]

It has come to our attention that some operators are driving the unit with the turntable rotated 180 degrees so that the drive wheels are in the forward position under the counterweights and the steering wheels are in the aft position just in front of the platform. Braking the unit while driving in this position can result in very abrupt stops. This abruptness can result in injuries to an operator from being thrown about the platform. This is especially true when driving in this reversed position down a slope where faster than usual speeds may be attained if coasting is allowed.

Snorkel also issued revised decals to be affixed to its manlifts.

■■■ The court admitted these documents into evidence, and Snorkel contends that, in so doing, the court erred. Snorkel cites *Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 105, 488 A.2d 516, *cert. denied*, 303 Md. 471, 494 A.2d 939 (1985), for the proposition that subsequent remedial measures are inadmissible in product liability cases to show manufacturer wrongdoing. *See also, Wilson v. Morris*, 317 Md. 284, 296, 563 A.2d 392 (1989). Snorkel further contends that the exception allowing evidence of subsequent remedial measures for another purpose such as impeachment, proving ownership, control, or feasibility of precautionary measures (if feasibility

is controverted), *Troja,* 62 Md.App. at 115, 488 A.2d 516, is inapplicable to this case.

By relying on *Troja,* Snorkel attempts to sidestep the "standard of care exception" discussed in *Wilson,* 317 Md. at 298–302, 563 A.2d 392. The standard of care exception allows evidence of subsequent remedial measures if that evidence is used to provide " 'circumstantial proof that the applicable standard of care had not been met at the time of the accident or other occurrence in question.' " *Wilson,* 317 Md. at 298, 563 A.2d 392 (quoting 5 L. McLain, *Maryland Practice: Maryland Evidence,* § 407.1, at 410 (1987, 1989 Supp.)).

The Snorkelift product engineer testified that, prior to June, 1989 (the time of Mr. Tognocchi's accident), he did not drive the UNO–33E in the reverse configuration down slopes because he knew that there could be difficulties or problems. He also testified that, "if anyone had asked," Snorkel's recommendation with regard to driving the UNO–33E down slopes would have been to operate the machine in the forward configuration, not in the reverse configuration. The engineer also added that "nothing has changed between June of '89 and now relative to driving in that position [the reverse configuration]." In light of this evidence, the safety bulletin and decal were admissible as circumstantial proof that the applicable standard of care had not been met at the time of Mr. Tognocchi's accident. *Wilson,* 317 Md. at 298, 563 A.2d 392.

## VI. Application of Courts Article, § 11–108 to Wrongful Death Cases

Section 11–108 of the Courts Article establishes a cap of $350,000 for noneconomic damages that may be awarded in a personal injury action. In the case now before us, the trial court applied § 11–108 to the noneconomic damages awarded to Mrs. Tognocchi and to her daughter on their wrongful death claims. The court reduced Mrs. Tognocchi's award for noneconomic damages from $675,000 to $178,300 and similarly reduced Dawn's award for noneconomic damages from $650,-000 to $171,000. As a result, the aggregate amount of noneconomic damages awarded on the wrongful death claims totalled

$350,000.[3] No adjustment was made to the $125,000 amount awarded to Mr. Tognocchi's estate on the survival action.

▮▮▮ The Tognocchis contest the application of § 11–108 to their wrongful death claims and argue that, even if the cap is applicable, it should not be applied in the aggregate. · Lengthy discussion on these issues is unnecessary in light of *United States v. Streidel,* 329 Md. 533, 620 A.2d 905 (1993). In *Streidel,* 329 Md. at 537, 620 A.2d 905, the Court of Appeals overruled *Potomac Electric v. Smith,* 79 Md.App. 591, 558 A.2d 768, *cert. denied,* 317 Md. 393, 564 A.2d 407 (1989), and held "that the damages cap in § 11–108 of the Courts and Judicial Proceedings Article does not apply to wrongful death actions." (Footnote omitted.) We shall, therefore, remand this case so that the trial court may reinstate the awards for noneconomic damages as rendered by the jury.

## VII. Punitive Damages

▮▮▮▮ The Tognocchis' last assignment of error concerns the trial court's refusal to submit the issue of punitive damages to the jury.[4] At the time this case was tried, "implied malice" was the standard for imposition of punitive damages in non-intentional tort cases. *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 297 A.2d 721 (1972). The Court of Appeals overruled *Smith,* however, and established an "actual malice" standard with regard to the imposition of punitive damages in products liability cases. *Owens–Illinois v. Zenobia,* 325 Md. 420, 462, 601 A.2d 633 (1992).[5] The Court defined actual

---

3. The jury did not award noneconomic damages to the Tognocchi's son.

4. Punitive damages were sought only in connection with the estate's survival action; the Tognocchis did not seek punitive damages on their wrongful death claims. Had the Tognocchis requested punitive damages, their request would have been denied, as punitive damages are not recoverable in wrongful death actions. *Streidel,* 329 Md. at 552, 620 A.2d 905.

5. The Court decided that the new standard should be applied prospectively as well as retrospectively. *Zenobia,* 325 Md. at 471, 601 A.2d 633. The Court also changed the burden of proof for punitive damages from a preponderance of the evidence to "clear and convincing evi-

malice as "actual knowledge of the defect and deliberate disregard of the consequences." *Zenobia*, 325 Md. at 462, 601 A.2d 633. The Court further opined:

> Therefore, in order for actual malice to be found in a products liability case, regardless of whether the cause of action for compensatory damages is based on negligence or strict liability, the plaintiff must prove (1) actual knowledge of the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect.

> The knowledge component, which we hold is necessary to support an award of punitive damages, does *not* mean 'constructive knowledge' or 'substantial knowledge' or 'should have known.' More is required to expose a defendant to a potential punitive damages award. The plaintiff must show that the defendant *actually* knew of the defect and of the danger of the product at the time the product left the defendant's possession or control. [Emphasis in original; footnotes and citations omitted.]

> Furthermore, the plaintiff is required to show that, armed with this actual knowledge, the defendant consciously or deliberately disregarded the potential harm to consumers.... We [adopt] the characterization 'conscious or deliberate disregard,' and emphatically state that negligence alone, no matter how gross, wanton, or outrageous, will not satisfy this standard. Instead the test requires a bad faith decision by the defendant to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer.

*Zenobia*, 325 Md. at 462–463, 601 A.2d 633.

Mr. Tognocchi's estate argues that punitive damages were appropriate because Snorkel knew of the tendency of the machine to pitch and still refused to issue a warning or to

---

dence" and ruled that the new burden of proof should not be applied retrospectively. *Zenobia*, 325 Md. at 470, 601 A.2d 633. Thus, in order to recover punitive damages in this case, Mr. Tognocchi's estate must have shown, by a preponderance of the evidence, actual malice on the part of Snorkel.

remove the lift from the market. The evidence certainly demonstrates that Snorkel was aware that there could be problems if the lift were driven down a slope in the reverse configuration. Snorkel's concern stemmed primarily from the fact that the controls would be reversed thereby increasing operator confusion. With regard to the lift pitching, Snorkel's concern focused on what might occur when the boom was elevated. After Wampler tested the machine, it was decided by all parties that operator error had been the cause of the Flaharty accident. While the wisdom of this conclusion may now be suspect, particularly in light of Mr. Tognocchi's death, we cannot say that the evidence was sufficient to show actual malice on the part of Snorkel so as to warrant submitting the issue of punitive damages to the jury.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.

CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY THE APPELLANT/CROSS APPELLEE.

WENNER, Judge, dissenting.

The majority has concluded that the question of whether Tognocchi's use of the Snorkelift to ascertain or illustrate how the Flaharty accident happened was properly submitted to the jury. I most respectfully dissent.

## ASSUMPTION OF THE RISK

Snorkel contends that Tognocchi assumed the risk of injury as a matter of law while attempting to replicate the Flaharty accident. In doing so, Tognocchi drove the Snorkelift down the same ramp and in the same configuration that it had been driven by Flaharty when Flaharty was injured. I agree. In my opinion, just as *Ciriago v. State,* 57 Md.App. 563, 471 A.2d 320, *cert. denied,* 300 Md. 152, 476 A.2d 721 (1984), presented us with the "very model of the *bona fide* inventory of personal

property ... [and] the very model of the spontaneous blurt," *Id.*, 57 Md.App. at 566, 471 A.2d 320, we are here presented with the very model of assumption of the risk.

Although I agree with the majority that "[T]he doctrine of assumption of risk will not be applied unless the undisputed evidence and all permissible inferences therefrom clearly establish that the risk of danger was fully known to and understood by the plaintiff," I believe that that is exactly what we have here.

In the first place, Tognocchi knew the circumstances of Flaharty's accident. Moreover, it is obvious that Tognocchi was not satisfied with the "clean bill of health" given the Snorkelift by Wampler, although Tognocchi was present during Wampler's examination of the machine. Despite Wampler's "clean bill of health," Tognocchi continued to red-tag the Snorkelift because he believed there was "something peculiar about the brakes and the way the machine stopped."

Instead of obtaining an outside expert, Tognocchi himself conducted a further investigation of the Snorkelift. After arranging for Young to videotape his examination of the machine, Tognocchi drove the Snorkelift just as Flaharty had driven it. In fact, the transcript of the videotape reveals that Tognocchi reversed the configuration of the Snorkelift and said to Young, "I'm going to take it down the other way. I think we'll get some more impact. Okay ... I think this is the way it was." Under these circumstances, it is inconceivable to me that Tognocchi was doing anything other than replicating the Flaharty accident. Consequently, I do not agree with the majority's assertion that there were several inferences that could have been drawn from Tognocchi's comment. Thus, I conclude that Tognocchi assumed the risk of injury as a matter of law.

As the Court of Appeals put it recently in *Schroyer v. McNeal,* 323 Md. 275, 283–284, 592 A.2d 1119 (1991),

> The test of whether the plaintiff knows of, and appreciates, the risk involved in a particular situation is an objective one, ... and ordinarily is a question to be resolved by the

jury.... Thus, "the doctrine of assumption of the risk will not be applied unless the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff...." On the other hand, when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court. (Emphasis in original. Citations omitted.)

Under the circumstances that I have just described, it is absolutely clear to me that Tognocchi, a person of normal intelligence, must have understood the danger of operating the Snorkelift in the manner in which it had been operated by Flaharty at the time of his accident.

Of course, there are circumstances under which one may knowingly and intentionally undertake an action that he or she knows exposes him or her to risk without foreclosing his or her ability to recover for injuries sustained as a consequence. For example, if a tenant in an apartment complex attempts to traverse an icy sidewalk that is the tenant's only means of egress from the tenant's apartment, the doctrine of assumption of the risk would not apply because taking the risk is neither voluntary nor unreasonable. The tenant's alternative would constitute a form of imprisonment. *See, Rountree v. Lerner Dev. Co.*, 52 Md.App. 281, 285–86, 447 A.2d 902 (1982).

Thus, when one is confronted with a Hobson's choice, that is, either take a risk or give up a valuable right, *e.g.*, reaching one's place of employment, the reasonableness of taking the risk is a question for the jury. Nonetheless, Tognocchi was under no such compulsion. I would reverse the judgment of the circuit court.

Judges Bloom and Harrell have authorized me to say that they join in this dissent.