533 A.2d 9

Dawn Michelle CAMPBELL, et al.

v.

MONTGOMERY COUNTY BOARD OF EDUCATION, et al.

No. 257, Sept. Term, 1987.

Court of Special Appeals of Maryland.

Nov. 10, 1987.

Certiorari Denied Feb. 24, 1988.

Martin H. Freeman (Patricia P. Richardson, Robert K. Jenner and Freeman & Richardson, P.A., on brief), Bethesda, for appellants.

Clyde C. Henning, Associate Co. Atty. (Paul A. McGuckian, Co. Atty. and Joann Robertson, Sr. Asst. Co. Atty., on brief), Rockville, for appellees, Montgomery County Bd. of Educ. and Rubinstein.

Joseph A. Lynott, III (Lynott and Craven, P.A., on brief), Rockville, for appellee, Turner.

Argued before GILBERT, C.J., and GARRITY and POLLITT, JJ.

GILBERT, Chief Judge.

On a motion for a judgment *non obstante veredicto*, the trial judge in setting aside a substantial jury verdict opined:

"A 13 year old with an IQ as high or higher, at that time, than most of the people in this room, with capacity and experience—who had engaged in prior voluntary sex and had then discussed it with her mother, who had previously, against the rules of the school and knowingly so, entered the boys' locker room on four or five other occasions, and undertook directly and knowingly to do so about three months after she testified that she was forcibly raped by two individuals, one holding her while the other raped her—all of which gave her a degree of

experience, a degree of knowledge, a degree of under-standing and a degree of assault, which places her in a category at the highest level of the scale, not at the lowest level, comparing what she undertook to do, with that knowledge, that experience, that capability—and she says to Mr. Rubinstein, 'Why didn't you find me and protect me?' "

The legal effect of that ruling was to declare that the young female plaintiff was guilty of contributory negligence or assumption of the risk, as a matter of law, when she impermissibly entered a boys' locker room and was sexually assaulted and molested.

In this appeal we shall examine the propriety of that ruling. There are, however, other peripheral issues we shall also address.

First, we set the scene as revealed by the testimony. On a late October day, 1983, Dawn Michelle Campbell was attending Sligo Junior High School in Montgomery County, Maryland. Because she had broken a finger in a fight with another girl, she was excused from participating in the scheduled physical education class.

According to Dawn's testimony, she was in the gymnasium when the class period began. She left the class and went outside to the athletic field when a teacher, Steven Rubinstein, ordered her back inside the building because she was being disruptive of his class. Dawn testified that she was not told exactly where she should report when she re-entered the school building.

Rubinstein's version of that portion of the facts is somewhat different. He told the jury that he spoke to Dawn after he had been called over by another teacher, Mr. Quail. That teacher was standing in an area near the school parking lot. With him were two or three of Rubinstein's students, including Dawn and another student, "Melody." Quail allegedly told Rubinstein that the students had been talking in the hallway. Rubinstein, who was the boys' physical education teacher, ordered his students to join the

rest of the class. He told Dawn and Melody to go to their own class "out in the field." Rubinstein said that he watched the two girls walk some distance towards their class on the playing field, and then he proceeded to his own class.

Dawn further related to the court that when she re-entered the building she met a fellow student, "Georgia," who requested they go into the boys' locker room. Dawn agreed. Although Georgia started toward the locker room with Dawn, she apparently did not enter it.

According to Dawn, she had been in the boys' locker room on four other occasions during the preceding two months. Each of those occasions was without anyone's permission to enter the room and without her alerting any teacher as to her intent. Rather, she testified that she knew that she was not supposed to enter the locker room. Furthermore, she deliberately concealed that activity from the school staff as illustrated below:

"Q. Did you tell any teacher, or anyone else on the school staff, that you were going to go to the boys' locker room the first time that you went there?

A. No.

Q. Did you tell the teacher, or any member of the staff, anytime before you went to the boys['] locker room?

A. No.

Q. Did you try to hide the fact that you were going to that boys' locker room?

A. Yes.

Q. How did you do that?

A. I didn't tell anybody, and I didn't let anybody see me go in, any teachers.

Q. You made sure that no teacher was looking at the time you went in, is that right?

A. Yes."

On one of her visits to the boys' locker room, Dawn was shown an old shower area in the back of the locker room. The area was "off limits" to the students. Two sets of

lockers with a piece of plywood attached to them partitioned the restricted area from the rest of the boys' locker room. Nevertheless, there was a small space between the lockers and the edge of the wall.

When Dawn entered the boys' locker room on the day of the happening giving rise to this litigation, no one else was there. Immediately after she entered, she heard somebody coming, but she made no attempt to leave the room. Thinking the footsteps might be those of a teacher, Dawn testified that she hid in the old shower area because she knew she "was not supposed to be in [the boys' locker room, and she hoped to avoid detection by a teacher]." As soon as she entered the restricted area, Matt Stoulberg, a student, followed her. The two were engaged in "voluntary" osculation for no more than thirty seconds when Rudy Crutchfield, another student, walked into the area. Matt and Dawn stopped kissing. Rudy grabbed Dawn from behind, pulled her onto his lap and began molesting her. While Dawn was screaming and trying to push Rudy away, a group of about fifteen boys arrived. "They all just piled on her and stuff," Matt Stoulberg said. Dawn related that the boys, of whom she could only name a few, grabbed her, pulled off her sweat shirt and brassiere, and sexually molested her by groping and fondling her breasts and "between ... [her] legs." Minutes later, a second group of students, including Clarence Turner, joined in the assault. Dawn narrated that at that time some of the students from the first group departed. She told the jury that "people were just going in and out the whole time." The assault by the second wave consisted of about ten to fifteen students molesting Dawn in the "same way as the first" group had.

Dawn also told the jury that Turner said he wanted to rape her. Sylvester Hackney, one of the students who witnessed the incident, identified Turner as one of the students that he "pulled off" of Dawn. Alfred Giles, another student who witnessed the sexual molestation, also identified Turner as one of the assailants.

According to Dawn, when she screamed for help, the boys covered her mouth so that she would not be heard. Giles in a videotaped deposition, related that he heard Dawn screaming "so loud that she could not scream no louder." At that time Felix hit her in order to quiet her. Giles further stated that he saw Felix cover Dawn's mouth. The assault lasted about one-half hour and came to an end when the bell rang and the group in the old shower area "started to break up" and depart.

While the assault was occurring in the old shower area, Rubinstein was on the playing field. He left the field a few minutes after the first bell had rung to talk to the boys and to gather the physical education equipment. By the time he returned to the school building, some of the students had preceded him into the locker room. As he walked into the locker room, he heard footsteps and some "banging" coming from the old shower room. He yelled, "[W]hoever is back there, get out of there." Rubinstein heard footsteps, and then three to five male students squeezed out of the opening into the shower area. After reprimanding the students for being in an "off-limits" area, Rubinstein said that he stuck his head in the opening between the lockers and the wall and listened for 10 to 15 seconds. Rubinstein testified that he then made "the statement that there better not be anybody else, and then I listened again, and I was satisfied there was nobody in there." Rubinstein told the jury that, although he could not see much other than the area directly in front of the opening, he decided not to go into the old shower area because he would not physically have fit through the opening. He weighed about 210 pounds at the time of the incident. Rubinstein remained in the boys' locker room for the rest of the period, probably five or six minutes, and he did not hear any noise coming from the restricted area.

When the dismissal bell rang, Rubinstein dismissed the boys, and he watched them leave. After visiting the guidance office, he walked back toward the locker room "a couple of minutes" later. While enroute he was told by a

student that there was a girl in the boys' locker room. Rubinstein went immediately to the boys' locker room to see if there was a girl there, but he did not look in the old shower area.

Dawn testified that after the bell rung, she left the locker room with the assistance of Alfred Giles and another youth who, having witnessed the assault, went into the shower area to help Dawn gather her clothes and leave the locker room. Sylvester Hackney, who also claimed to have helped Dawn leave the locker room, asserted that he told Dawn to duck down as she was leaving the room so that she would not be seen by the teacher whose figure he had observed through the window. Dawn went to the gym, where a substitute teacher, noticing her appearance, inquired as to what had happened. Apparently not satisfied with Dawn's answer that she had hurt her foot, the teacher took Dawn to the principal's office. Dawn was suspended for five days for going into the boys' locker room. Rubinstein stated that not until a few days after the incident was he made aware of the fact that Dawn had been molested.

## I

Dawn, by her mother, and her mother, Harriet Campbell, individually, sued the Montgomery County Board of Education (Board), Steven Rubinstein, and students Sylvester M. Hackney,[1] Oliver M. Bowen,[2] Felix Kordoru, Steven Brown,[3] Rudolph Q. Crutchfield,[4] and Clarence Turner. Prior to the submission of the matter to the jury, the trial judge entered judgment in favor of Turner on the ground that the evidence was sufficient only to show Turner's "being there, and present." In sum, the evidence, in the

---

1. The claim against Hackney was dismissed prior to trial.

2. The suit against Bowen was "settled and dismissed" prior to trial.

3. Brown was voluntarily dropped as a party defendant.

4. Crutchfield was also voluntarily dismissed as a defendant.

trial judge's view, was insufficient to support a verdict against Turner.

The jury returned verdicts in favor of Dawn against the Board, Rubinstein, and Kordoru in the amount of $212,-500.00; in favor of her mother against the Board and Rubinstein in the sum of $86,275; and in favor of mother and daughter against Kordoru for $10,000 punitive damages.

The trial judge, as we have seen, struck those verdicts and entered judgments in favor of the Board and Rubinstein. The verdict against Felix Kordoru was permitted to stand.[5]

Preliminarily, we shall address the issue posed by appellees, namely, that there was insufficient evidence of primary negligence on the part of Steven Rubinstein or the Board to justify allowing the case to be considered by the jury.

The record reveals that the nature and extent of Rubinstein's liability was submitted to the jury. Dr. Stephens, the then Assistant Principal of Sligo Junior High School, testified that the standard of care to which Mr. Rubinstein was required to adhere in the performance of his duties included supervising the locker room after the gym class. She confirmed that the school administration would expect teachers "at least to glance at all the places within the locker room where it was logical that students would be." Dr. Stephens further agreed that the responsibilities of teachers in the position of Mr. Rubinstein included preventing male students from engaging in the sexual assault of female students. Additionally, Dr. Stephens confirmed that if a teacher had reason to believe something was amiss in the locker room he was responsible for checking on it before he departed from the room.

Mr. Rubinstein admitted that he was familiar with the practices and procedures for supervision outlined in the

---

5. No appeal has been noted from that judgment.

"Policies and Regulation Handbook, Montgomery County Public Schools." Specifically, he testified to his familiarity with paragraph 3 of the Administrative Regulations that required that "[u]nit members shall exercise responsibility for adequate supervision of pupils in *all* parts of the building during duty hours and during assigned supervision of school sponsored activities." (Emphasis added.) Mr. Rubinstein also testified that he was familiar with paragraph (b) of those rules. That paragraph states: "Unit members shall exercise responsibility for supervision of the movement of pupils in the school building, and in their activities on the school grounds."

During his testimony, Mr. Rubinstein conceded:

1. that he was responsible for supervising the locker room at the time of the incident and that his responsibility included insuring that the students were "doing what they were supposed to be doing"

2. that he heard a "banging, banging noise" coming from the old shower area

3. that when the boys came running out of the old shower area, he did not ask them why they were there

4. that he recognized the possibility that people might still be in the old shower area but failed to investigate for fear that, among other reasons, he might "rip his shirt" while squeezing through the small opening

5. that he knew of another occasion when a girl had been in the boys' locker room.

Maryland has adopted a very restrictive rule about taking cases from the jury in negligence actions. *Banks v. Iron Hustler Corp.*, 59 Md.App. 408, 475 A.2d 1243 (1984). Over twenty years ago, the Court of Appeals in *Fowler v. Smith*, 240 Md. 240, 246, 213 A.2d 549, 554 (1965), said:

"... Maryland has gone almost as far as any [other] jurisdiction that we know in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, *legally sufficient* as

tending to prove negligence, and the weight and value of such evidence will be left to the jury." (Emphasis in the original.)

*See also Moodie v. Santoni,* 292 Md. 582, 587–88, 441 A.2d 323, 326 (1982); *Beahm v. Shortall,* 279 Md. 321, 341–42, 368 A.2d 1005, 1017 (1977); *Banks v. Iron Hustler Corp.,* 59 Md.App. at 423, 475 A.2d at 1250–51. The jury could reasonably have found from the evidence adduced at trial that Mr. Rubinstein was negligent under the circumstances and that Dawn was entitled to recover. Patently, if Rubinstein, the Board's agent, servant or employee, was negligent, the Board is liable, since there is no question as to the former's being within the scope of his employment.

We now turn to the question of whether Dawn's own actions preclude her right to recover.

In granting the motion for judgment n.o.v. in favor of the Board and Rubinstein, the trial judge decided as a matter of law that Dawn Campbell "was contributorially negligent and assumed the risk of her own harm; and it was not a matter to be submitted to the jury, and that as a matter of law neither the defendant Rubinstein nor the Board can be liable in this case, for any amount."

■ When reviewing the granting of a motion for judgment n.o.v., this Court must consider the evidence and the reasonable inferences to be drawn from it in the light most favorable to the party opposing the motion. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.),* 283 Md. 296, 327, 389 A.2d 887, 905 (1978); *Mondawmin Corporation v. Kres,* 258 Md. 307, 266 A.2d 8 (1970).

With that standard of review firmly in mind, we turn now to the major issue in this appeal. As a matter of law, is an exceptionally intelligent thirteen-year-old female, who has previously voluntarily and involuntarily experienced sexual relationships, guilty of contributory negligence or assumption of the risk when she voluntarily but impermissibly enters a boys' locker room?

Phrased in less legalese, as a matter of law not of fact, does a thirteen-year-old female who impermissibly enters a boys' locker room subject herself to a sexual assault? Is the boys' locker room a den of iniquity so overrun with sexual deviates that the mere presence of a young female translates into an open invitation with impunity to assault, probe, paw, and finger her body?

To hold, as did the trial judge, that Dawn was guilty of contributory negligence or assumption of the risk when she entered the boys' locker room is to indict implicitly, as a matter of law, all young males utilizing segregated locker rooms. The finding implies that, insofar as civil law is concerned, if a young female enters a boys' locker room she simultaneously strips herself of any vestige of dignity and submits herself to whatever type of sexual aggression she encounters.

■ Ordinarily, the question of whether a plaintiff was contributorially negligent or assumed the risk is one for the fact finder, not the court. *Menish v. Polinger Co.*, 277 Md. 553, 356 A.2d 233 (1976); *Brock v. Sorrell*, 15 Md.App. 1, 288 A.2d 640 (1972). Either, if present, will bar recovery by a claimant. *Casper v. Chas. F. Smith & Sons, Inc.*, 71 Md.App. 445, 526 A.2d 87 (1987).

■ Contributory negligence, it is said, "occurs whenever the injured person acts or fails to act in a manner consistent with the knowledge or appreciation, actual or implied, of the danger or injury that his or her conduct involves." Gilbert, *Maryland Tort Law Handbook*, § 11.4.1; *Schwier v. Gray*, 277 Md. 631, 357 A.2d 100 (1976).

A case may not be taken from a jury on the ground of contributory negligence unless the evidence demonstrates "some prominent and decisive act which directly contributed to the ... [incident] and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Balto. Transit Co. v. Castranda*, 194 Md. 421, 434, 71 A.2d 442, 447 (1950); *Baltimore & O.R.R. v. Plews*, 262 Md. 442, 278 A.2d 287 (1971; *see also Kirby v.*

*Hylton*, 51 Md.App. 365, 443 A.2d 640 (1982); *Rafferty v. Weimer*, 36 Md.App. 98, 373 A.2d 64 (1977). *Myerberg v. Thomas*, 13 Md.App. 539, 284 A.2d 29 (1971).

As we see it, for Dawn to be barred from recovery, as a matter of law, the evidence must clearly demonstrate that she knew or should have known that by entering the boys' locker room she subjected herself to danger or injury. The evidence, however, is to the contrary. Having on four prior occasions gone into the boys' locker room without being confronted by danger or meeting with injury, it can hardly be said that, as a matter of law, Dawn knew or should have known the peril that awaited her on the date of the incident.

Under Maryland law one assumes "the risk as a matter of law only when the undisputed facts permit but one reasonable determination." *Hooper v. Mougin*, 263 Md. 630, 635, 284 A.2d 236, 239 (1971); *Pfaff v. Yacht Basin Co.*, 58 Md.App. 348, 473 A.2d 479 (1984).

"[A] plaintiff is said to have assumed the risk of injury when, with full knowledge and understanding of an obvious danger, he voluntarily abandons his right to complain by exposing himself to that particular risk."

*Hooper v. Mougin*, 263 Md. at 633, 284 A.2d at 238. *See also* Gilbert, *Maryland Tort Law Handbook*, § 11.6.

The facts in the instant case viewed in the light of *Hooper* and *Impala* reveal that Dawn had visited the boys' locker room on four previous occasions. At no time during those impermissible visitations was she sexually molested or threatened. Patently, when she entered the locker room on the day of the incident, she had no reason to expect that she would be subjected to attack by some of the male students. Since her earlier excursions into the boys' locker room were without incident, she was not obliged as a matter of law to anticipate that she would be sexually molested upon a subsequent visitation.

We think the trial judge improperly invaded the province of the jury when he granted the judgment n.o.v., and accordingly we vacate that judgment. Because the recov-

ery by Dawn and her mother from the Board and Rubinstein may be limited by Md.Code Education Article Ann. § 4–105 to $100,000, the case is remanded to the Circuit Court for its determination as to whether § 4–105 is applicable to the Board as well as Rubinstein.

## II

Aside from the question of the judgment n.o.v. is the matter of the trial judge's entry of a judgment at the conclusion of the evidence in favor of Clarence Turner. Dawn and her mother aver that the judge erred because there was ample evidence to support the claim's being submitted to the jury.

"The general rule by which the sufficiency of the evidence is to be tested on appellate review is the same for a judgment n.o.v. and a directed verdict. The evidence and the reasonable inferences to be drawn from it are to be considered in the light most favorable to the party opposing the motion." *Impala Platinum, Ltd. v. Impala Sales (USA)*, 283 Md. at 327, 389 A.2d at 905. *See also* Md. Rule 2–519(b).

Assuming the truth of all the appellants' credible evidence and all inferences fairly deducible therefrom, *id.* at 329, 389 A.2d at 906,

"if there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by declaring a directed verdict. In such circumstances, the case should be submitted to the jury and a motion for directed verdict denied."

*Id.* at 328, 389 A.2d at 906. The trial court in the case *sub judice* removed the issue of Turner's liability from the jury's consideration on the ground that there was no evidence establishing that Turner did any more than be "there, at some point in time."

The trial testimony pertaining to Turner's participation demonstrates that the nature and extent of Turner's participation was a jury question.

Turner was identified by Dawn as one of the boys in the second group who entered the off-limits area where Dawn was assaulted. The record shows:

"Mr. Freeman [Dawn's attorney]: Now you mentioned, or you described some of the things that happened. Would you pick up from where we interrupted, and describe everything that happened after that?

Dawn Campbell: A second group of boys came in. That's when Clarence Turner came in and Bobby Bowen, and some others.

  \*  \*  \*  \*  \*  \*

Mr. Freeman: What did the second group of students then do? Again, I have to tell us what ensued.

Dawn Campbell: They just felt my breasts, and the same as the other one, Dion—or Clarence—

Mr. Freeman: Mr. Turner?

Dawn Campbell: —Turner, yeah, he wanted to rape me.

Mr. Freeman: How did you know that?

Dawn Campbell: He said it."

Dawn's testimony together with that of Hackney was sufficient, we believe, to permit a rational finder of fact to infer that Turner was a participant in the assault upon Dawn. Ergo, the question of Turner's culpability and, hence, liability should have been submitted to the fact finder. Because the court erred in granting Turner's motion for judgment, we must reverse and remand that particular claim for a new trial.

JUDGMENT N.O.V. IN FAVOR OF APPELLEES MONTGOMERY COUNTY BOARD OF EDUCATION AND STEVEN RUBINSTEIN VACATED AND CASE REMANDED FOR ENTRY OF A JUDGMENT, IN ACCORDANCE WITH THIS OPINION, IN FAVOR OF APPELLANTS AGAINST THE APPELLEES, MONTGOMERY

COUNTY BOARD OF EDUCATION AND STEVEN RUBINSTEIN.

JUDGMENT IN FAVOR OF APPELLEE CLARENCE TURNER REVERSED AND CASE REMANDED FOR A NEW TRIAL.

COSTS TO BE PAID BY APPELLEES.