51 A.3d 761

Wayne H. GOSS, et al.

v.

The ESTATE OF Bertha JENNINGS, et al.

No. 1931, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Aug. 31, 2012.

152

154

Walter E. Gillcrist, Jr. (Anne K. Howard, Budow & Noble PC, on the brief) Bethesda, MD, for appellant.

Lisa Schertler, Washington, DC (Schertler & Onorato, LLP; Laura Mullally, Douglas F. Gansler, Atty. Gen., Pikesville, MD; Joseph Mallon, Marshall N. Perkins, Mallon & McCool, LLC, Baltimore, MD), on the briefs, for appellee.

Panel: ZARNOCH, JAMES R. EYLER * (Retired, Specially Assigned), and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

ZARNOCH, J.

The principal issue in this case is whether the non-economic damage cap imposed by Md.Code (1974, 2006 Repl.Vol.),

---

* Eyler, James R., J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

Courts & Judicial Proceedings Article (CJP), § 11–108 applies separately or collectively to damages awarded in a wrongful death and a survival action.[1] This and additional questions arise from a $1.37 million judgment entered in a wrongful death and survival action stemming from the death of Rodney Jennings ("Jennings"), an inmate in the custody of the Maryland Division of Corrections ("DOC").

While working on a litter pickup detail on the Capital Beltway (I–495) in Landover in Prince George's County, Jennings was struck and killed by a dump truck owned by W.H. Goss Trucking, LLC and operated by Wayne H. Goss ("Goss" or "appellants"). Jennings' estate, the estate of his mother, and three beneficiaries ("appellees")[2] filed a wrongful death/survival action against Goss in the Circuit Court for Prince George's County. Later, they amended their complaint to include claims against the DOC and the State Highway Administration ("SHA") (collectively, "the State"). In turn, Goss filed a third-party complaint against the State, and the State filed a cross-complaint against him, with both parties seeking contribution or indemnification against the other.

In the jury trial that followed, Goss and the State moved for judgment at the end of plaintiffs' case and at the close of all the evidence. The court initially denied the motions, but reserved judgment on the renewed motions made at the close of all the evidence. The jury then returned a verdict against Goss and the State in the amount of $2,025,000, which represented the sum of the damages awarded in the survival action ($350,000) and the wrongful death action ($1,675,000).

Goss and the State moved for judgment notwithstanding the verdict (JNOV). Goss also moved for a new trial and remittitur. The court granted the State's motion, denied Goss'

---

1. A wrongful death action is authorized by CJP §§ 3–901–3–904. The statutory sources for a survival action are CJP § 6–401 and Md.Code (1974, 2011 Repl.Vol.), Estates & Trusts Article § 7–401(y).

2. For ease of reference, we will use the term "appellees" to refer to these parties, who were the plaintiffs below.

motions and reduced the damage award to $1.37 million, prompting this appeal and cross-appeal.

## Factual Background

At the June 14, 2010 trial, the evidence adduced that, on the morning of August 23, 2007, Jennings and at least two other inmates, Denard Thomas ("Thomas") and Christian Taylor ("Taylor") were driven by a correctional officer in a DOC van to pick up litter along the southbound shoulder of I–495. Another SHA employee accompanied the crew in an SHA dump truck. Upon arriving at the intersection of I–495 and Route 202, the inmates were discharged from the van, donned bright green fluorescent safety vests and began walking southbound on the shoulder of I–495. Shortly thereafter, Jennings, Taylor and Thomas crossed the exit ramp by foot and entered into the gore [3] area of the beltway.

## I. The Accident

Lee Bayersdorfer, who was driving a tractor-trailer in the lane closest to the exit ramp, observed that immediately before the accident, Goss accelerated, passed him on the left, and cut in front of him to take the Route 202 exit. At this time, and when he was at a distance of approximately 75 feet from the exit, Goss saw the inmates walk across the exit ramp and into the gore and sounded his horn to "warn" them.

Upon hearing the horn, the inmates in the gore turned around to see both Goss' dump truck and Bayersdorfer's tractor-trailer "bearing down on [them] at a high amount of speed." Thomas observed Goss' dump truck "speeding up [and] trying to get over" to the exit lane and then "speed[ing] ... up in front of the other truck," as it "cut all the way over to the right." Both men believed that the dump truck was going to enter the gore where they were standing. Nonethe-

---

3. A gore is a narrow, triangular area of land where an exit lane veers away from the travel portion of the lane and becomes an exit ramp. The triangular area is typically separated from the travel portion of the roadway by two solid white lines along its borders.

less, they remained stationary because the horn put them in a "state of shock," freezing them in place. Although Taylor thought about escaping Goss' apparent path by "slip[ping] between [the vehicles]," the trucks were so close to the gore that he was afraid he would be "suck[ed] in. . . ." He "thought [he] was going to die" and would have run if he had been positioned closer to the exit ramp. But, given his position in the gore, "there was nowhere to run."

When Goss' dump truck was about five to eight feet away from him, Jennings ran from the gore back across the exit ramp. According to Taylor:

[W]e was [*sic*] in the middle [of the gore] when we saw the trucks coming, there was really nowhere for us to run to, you know, but [Jennings] tried to—he did a movement like this and he tried to go back across the ramp where we had come from. And I grabbed after him, but he was a little bit bigger than me so he got away from me. And [Goss' dump] truck just came right through and met him.

At that point, Goss "really" applied the truck's brakes, but was unable to avoid striking Jennings, who later died from accident-related injuries.

## II. The Post–Accident Inspection

After the accident, Maryland State Troopers Mallon and Sliffer directed Goss to drive to a nearby shopping center where they could conduct a post-accident inspection. Mallon slid underneath the truck on his back, looking up at the bottom of the truck to inspect its brakes. Sliffer remained outside of the dump truck and recorded the brake measure- ments on 3x5 cards, as Mallon shouted out the measurements to him.

The State Troopers then directed Goss to drive to a weigh station, where they determined that the truck weighed 78,400 pounds, in violation of the 70,000 pound weight limit imposed by Md.Code (1977, 2009 Repl.Vol.), Transportation Article (TA) § 13–919.[4] Using a computer at the station, Sliffer

---

4. Section 13–919(c)(2) provides that the maximum gross weight limita- tion for a four-axle dump truck is 70,000 pounds.

entered the data from the 3x5 cards and prepared a report which reflected Mallon's finding that three of Goss' brakes were out of adjustment. Mallon reviewed the inspection report for accuracy and confirmed that it contained the same measurements he had orally conveyed to Sliffer. He then provided the report to the police crash team, which transferred the data into its post-collision inspection report. Over Goss' objection, both reports were admitted into evidence as plaintiffs' exhibits.

## III. Expert Testimony

David Stopper, who testified as an expert in commercial trucking, accident reconstruction, and the proper operation of commercial motor vehicles, opined that, based on his review of the police paperwork, depositions, accident scene photos, safety manuals, and Mallon and Sliffer's post-accident inspection reports, on the day of the accident, the truck was in "an out-of-service condition which mean[t] that ... the vehicle ... [was] likely to cause an accident or breakdown." Stopper concluded that the two largest brakes on Goss' dump truck were "significantly" out of adjustment, resulting in a loss of more than 25% of the truck's braking efficiency. As a result, the truck was "not safe to operate" on the day of the accident, which should have been apparent to Goss during a pre-trip inspection. According to Stopper, Goss' failure to maintain his brakes in proper working order was a violation of the standard of care applicable to commercial vehicle operators.

Stopper also testified that the weight of Goss' truck on the day of the accident violated standard limits, and, together with the defective brakes, "decreased [the] truck's ability to stop." Stopper opined that Jennings "would have cleared the truck" if Goss' brakes had been in working order and the truck weighed 8400 pounds less. In making this conclusion, Stopper assigned to Jennings a speed of 7.5 feet per second, which approximates the pace of a 60–year–old male jogger. Stopper explained that, though Jennings was 28 years old at the time of the accident, this pace was appropriate because Jennings was heavyset.

## IV. The Horn Demonstration

Additionally, Stopper testified that the way in which Goss used his truck's air-horn on the day of the accident violated the applicable standard of care. Over Goss' objection, Stopper conducted an outdoor demonstration of the same kind of air horn that was on Goss' truck and blew it at a distance of 75 feet from the jury. In Stopper's opinion, Goss created the dangerous condition which required him to use his horn:

> [I]f Goss had been slowing down appropriately and fallen in behind the other vehicle and used the exit ramp and had been coming on it at the appropriate speed ... there would be no reason for him to be sounding his horn and warning others because he should have been able to stop in the distance he could see.

## V. The Post–Trial Motions

At the close of all the evidence, Goss and the State renewed their earlier motions for judgment, and the court reserved ruling until after the jury returned a verdict against both parties in the amount of $2,025,000. This award represented the sum of $350,000 and $1,675,000 in noneconomic damages for the survival action and wrongful death claim, respectively. Thereafter, Goss asserted that he was entitled to cross-judgment against the State and filed motions for JNOV, a new trial, and a remittitur. With respect to the remittitur, Goss argued that under CJP § 11–108, when there are two or more beneficiaries in a death claim, the cap is set at 150% of $680,000 or $1,020,000.[5] He also urged the court to reduce the entire damage award to that amount, essentially eliminating the $350,000 award in the survival action, along with more than $650,000 for the wrongful death.

The State also moved for JNOV, arguing that it breached no duty to Jennings, that it was not the proximate cause of his death and that he was contributorily negligent. It also argued

---

**5.** Under § 11–108(b), the cap increases by $15,000 each year. The $680,000 figure was the one applied at the time of this action.

that under the Maryland Tort Claims Act ("MTCA"), Md.Code (1984, 2009 Repl.Vol.), State Government Article (SG), § 12–101, *et seq.* and particularly § 12–104(a)(2), its liability could not exceed a total of $200,000 for any and all claims made against it.

On September 24, 2010, the court heard and denied Goss' motions and granted the State's motion for JNOV. Specifically, the circuit judge noted:

> I don't see where the State was negligent as a matter of law. Now, I'll contrast this later with the other case, but the fact is he was moved from the one side and across the ramp to the gore area.

> If we look at from your blocking vehicle or moving in the ramp while they cross or if we look at putting them in a van to take them across, it's a moot point. They got from point A to point B without a problem. They did. It's a fact. They moved from point A to point B without issue.

> If we say, okay, we need to have a blocking vehicle then at the gore area to protect them there, that's moot because they weren't hit in the gore area. He wasn't hit in the gore area. He was hit on the ramp. The State did nothing in this case that was negligent. It's incontrovertible. They got him across the ramp. He wasn't hit in the gore area. The State did nothing negligent and I'm going to grant [its'] Motion for Judgment.... [6]

---

6. Although acknowledging that the issue was moot, the circuit court addressed arguments concerning the MTCA damage cap, finding that if State liability were imposed in this case, it could not exceed $200,000:

> If you start from the theory that the State has sovereign immunity, then any recovery has to come by statute, and starting with no recovery and then moving to whatever the statute gives you would appear to me that there has to be something clear and unambiguous in the statute that would make this a multiple cap ... or a multiple of $200,000. I don't see that. When I see a single claimant per occurrence if Mr. Goss had hit three people, for example, then we would have three claimants. In fact, he hit one person. I don't have to get to the issue, but it seems to be clear that the $200,000 cap would apply if the State were negligent.

The court's rulings left the $350,000 survival action judgment intact and reduced the wrongful death awards to 150% of $680,000 or $1,020,000. Goss noted this appeal. The State and the other appellees cross-appealed.[7]

## QUESTIONS PRESENTED

Goss presents four questions for our consideration:

1. Did the trial court erroneously deny Goss' motion for JNOV when the undisputed evidence established Jennings' negligence by suddenly darting into the path of Goss' truck, and the absence of proximate causation between Goss' negligence and Jennings' death?

2. Did the trial court commit reversible errors in allowing irrelevant evidence of the truck's gross weight, hearsay evidence of the condition of its brakes, and an irrelevant horn demonstration?

3. Did the trial court erroneously impose two statutory caps in granting Goss' requested remittitur when only one cap applied?

4. Did the trial court improperly grant the State's motion for JNOV and deny Goss' cross-judgment against the State?

The appellees' cross-appeal presents this additional issue:

Whether the Circuit Court erred by (A) granting judgment notwithstanding the verdict to the State of Maryland, where the jury's findings that the State's negligence proximately caused Jennings' injuries and death were supported by the evidence, and (B) ruling that the State's total liability to all claimants is capped at $200,000, when the plain language of the Maryland Tort Claims Act applies the $200,000 cap to each "single claimant."

For the following reasons, we answer all of Goss' questions in the negative. We answer part A of appellees' question in

---

**7.** The State has abandoned its cross-appeal.

the negative and decline to reach part B. Thus, we affirm the rulings of the circuit court.

## DISCUSSION

### I. Motion for Judgment Notwithstanding the Verdict

Goss' challenge to the jury verdict is premised on two grounds. First, he argues that Jennings' decision to run from the gore made him contributorily negligent as a matter of law. Second, he asserts that Jennings' flight into the exit ramp was a superseding cause of the accident that relieves him of liability for negligence. We reject both contentions and hold that the evidence was legally sufficient to support the jury's conclusions.

### A. Standard of Review

Maryland has a "very restrictive rule" about removing negligence cases from the jury. *Campbell v. Montgomery County Bd. of Education,* 73 Md.App. 54, 62, 533 A.2d 9 (1987). If there is "any evidence, however slight, legally sufficient as tending to prove negligence," then the trial judge must leave the weighing and evaluating of that evidence to the jury. *Moore v. Myers,* 161 Md.App. 349, 363, 868 A.2d 954 (2005). Upon review of the circuit court's denial of a motion for JNOV, we apply the same standard, and "consider all the evidence, including inferences reasonably and logically drawn therefrom, in a light most favorable to the non-moving party." *Romero v. Brenes,* 189 Md.App. 284, 290, 984 A.2d 346 (2009). We will affirm the court's decision to submit the issue to the jury if we find that "evidence and the reasonable inferences to be drawn from it in the light most favorable to the party opposing the motion" sufficiently supports the jury's verdict. *Campbell,* 73 Md.App. at 63, 533 A.2d 9.

### B. Contributory Negligence

When a defendant raises a claim of contributory negligence against a plaintiff who has died in the underlying action, a presumption applies that the decedent "exercised

ordinary care for his own safety in accordance with the natural instinct of human beings to guard against danger." *Baltimore Transit Company v. State,* 194 Md. 421, 434, 71 A.2d 442 (1950). Contributory negligence will not be decided as a matter of law unless the evidence overcomes this presumption and demonstrates "some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Id.*

■ Here, whether Jennings exercised proper caution in running across the exit ramp is not so obvious that we can say as a matter of law that the jury was unjustified in finding him free from fault. Although Taylor "grabbed after" Jennings to prevent him from leaving the gore, Taylor testified that he, too, would have run he had been standing closer to the exit ramp. Moreover, contrary to Goss' assertion that Thomas and Taylor remained in the gore because they appreciated their relative position of safety, both men testified that they were "stuck" or "frozen" in the gore after hearing the horn and watching the truck barrel down on them. The fact that Jennings was struck on the exit ramp does not establish his negligence as a matter of law. Whether his decision to run was negligently or carelessly made was a question for the jury. It was not error for the circuit court to rule otherwise.

### C. Proximate Cause

■■ Goss' next contention is that Jennings' dash into the travel portion of the roadway was an intervening cause of the accident that relieves the appellants of liability for negligence. Generally, intervening conduct will break the chain of causation when the act is neither intended by the initial actor nor foreseeable as the probable result of his conduct. *See Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 337, 624 A.2d 496 (1992). Accordingly, the linchpin of whether an intervening act breaks the causal chain is foreseeability. *Id.* at 338, 624 A.2d 496.

■ Here, we find sufficient evidence to support the jury's finding that Jennings' death was the reasonably foreseeable

consequence of Goss' negligence. The jury heard evidence that Goss was speeding, traversing lanes, sounding a loud horn, and apparently heading directly toward the inmates. The totality of this evidence created a jury question as to the foreseeability of Jennings' flight, and it was permissible for them to conclude that Goss' conduct created the chain of events that caused Jennings' death. Accordingly, the trial court did not err in denying Goss' motion for JNOV on this basis.[8]

## II. Evidentiary Rulings

We are similarly unpersuaded by Goss' argument that the court abused its discretion by (1) admitting evidence of a gross weight violation; (2) allowing the horn demonstration; and; (3) admitting evidence of post-crash brake measurements.

### A. Standard of Review

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Brown v. Daniel Realty Co.*, 409 Md. 565, 583, 976 A.2d 300 (2009). We will not set aside the court's ruling unless the error "cause[s] substantial injustice." *Crane v. Dunn*, 382 Md. 83, 92, 854 A.2d 1180 (2004). Accordingly, an evidentiary ruling, even if manifestly erroneous, will not be disturbed if it was harmless. *See* Md. Rule 5–103(a). To the extent an evidentiary ruling involves resolution of a question of law, we review that decision *de novo. Id.*

---

8. We note briefly that the cases upon which Goss relies are inapplicable to the facts at hand. Unlike in *Trader v. White*, 10 Md.App. 703, 272 A.2d 84 (1971) and *Belle Isle Cab Co. v. Pruitt*, 187 Md. 174, 49 A.2d 537 (1946), we are not asked to decide whether the evidence was sufficient to raise the issue of vehicle speed as a jury question. And in *E.H. Koester Bakery Co. v. Poller*, 187 Md. 324, 332, 50 A.2d 234 (1946), the cause of a collision between a streetcar and a truck was "clearly the unexpected, and unforeseeable, entry of the truck upon the tracks at a point where the collision could not have been avoided." Given the facts before us, we cannot state with similar decisiveness that Jennings' entry onto the exit ramp was as "clearly" unforeseeable.

## B. Evidence of Weight Violation

 Goss argues that his violation of TA § 13–919 should not have been disclosed to the jury because Jennings was not a member of the class the statute was designed to protect. Given the totality of the evidence regarding the manner in which Goss approached and entered the ramp, loaded his truck, and maintained his brakes, we believe that the introduction of the weight violation cannot reasonably be understood as the pivotal evidence that tipped the verdict in favor of the appellees. In short, assuming an error did occur, we conclude that it was harmless as a matter of law. Therefore, we cannot conclude that the judge abused his discretion in admitting the evidence or that the evidence so prejudicially affected Goss' rights that he is entitled to a new trial.

## C. Horn Demonstration

 Citing *Andrews v. State*, 372 Md. 1, 25, 811 A.2d 282 (2002), Goss next contends that the court's failure to require appellees to establish "substantial similarity" between the horn demonstration and the actual event renders the demonstration irrelevant, misleading, and grounds for new trial. We disagree.

The record reflects that the purpose of the horn demonstration was to assist the jury in understanding the difference in decibel levels between an average car horn and the air-horn on Goss' truck. The test was intended for the jurors to "hear what this horn is and how it's different than the horn in their common experience." Appellees simply wanted the jury to hear the "loud blast of a loud horn." With this purpose, it would make no difference whether the horn demonstration occurred inside the courtroom, at the scene of the accident, or at a location determined by the trial court. We cannot say that the horn demonstration significantly affected the outcome of Goss' case, particularly when he, too, acknowledged: "It's a truck horn. It's supposed to be loud."

### D. Hearsay

■ Goss next submits that the lower court committed reversible error in allowing appellees to introduce inadmissable hearsay testimony and documentary evidence regarding the dump truck's purportedly faulty brakes (the post-accident reports). He argues that the "record is replete with indicia of untrustworthiness" which preclude the admission of that evidence.

Even if State Trooper Mallon's testimony was inadmissible hearsay evidence, we find that any such error in its admission was harmless. Even without this testimony, appellees presented sufficient evidence to support the jury's verdict. Appellees' expert witness testified that two of the truck's largest brakes were out of adjustment, resulting in a 25% loss in braking efficiency, and he opined that these defects should have been apparent to Goss. Eyewitness testimony indicated that Goss was negligent in the angle, speed, and direction at which he entered the exit ramp. In light of all the evidence, we hold that the jury verdicts were not substantially swayed by the admission of Mallon's testimony.

■ Moreover, although the post-accident reports were hearsay, they were admissible under the business records exception to the hearsay rule.[9] *See* Md. Rule 5–803(b)(6). The rule provides that records kept in the ordinary course of business are admissible as an exception to the hearsay rule. *Id.* The nature of the records may be established by a "qualified witness" who has sufficient knowledge of the record-keeping system and the creation of the contested record to establish their trustworthiness. *See id.; see also Davis v. Goodman,* 117 Md.App. 378, 417, 700 A.2d 798 (1997).

Here, Mallon testified that he routinely inspected vehicles and made such reports; that the reports "are generated as

---

9. Because we find that these records were properly admitted under the business records exception to the hearsay rule, we need not address whether they were also properly admitted under the public records exception. *See* Md. Rule 5–803(b)(6).

part of [his] function as [a member of] the police department," that they are kept in the "ordinary course of business;" and that he had personal knowledge of the process involved in making them. Hence, Mallon was a qualified witness who properly authenticated the post-accident reports.

■■■ We note further that a record of a regularly conducted activity that meets the foundational requirements of Md. Rule 5–803(b)(6) is presumptively trustworthy, and the burden to prove that the proffered evidence was generated under untrustworthy circumstances rests upon the party opposing its admission. *Owens–Illinois, Inc. v. Armstrong*, 326 Md. 107, 116, 604 A.2d 47 (1992).

Contrary to Goss' assertion, the presumption of trustworthiness is particularly robust here because the reports were prepared as part of the official duties of Maryland State Police employees. In addition, Mallon testified that he reviewed the post-accident reports, verified their accuracy, and was "positive" that the brake measurements were correct. We fail to see any basis for concluding that the reports were so untrustworthy that the court abused its discretion in admitting them.

## III. Non–Economic Damage Cap

Goss' next contention is that the court's decision to apply separate statutory caps to the survival and wrongful death actions was not authorized by CJP § 11–108. His claim hinges on the notion that, while the survival action and wrongful death claims are two separate causes of action, they result in one loss that should be subject to one cap.

### A. Standard of Review

Our review of the trial court's interpretation of a statute is *de novo*. *Maryland–National Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 181, 909 A.2d 694 (2006). We often resolve issues of statutory construction by considering "three general factors: 1) text; 2) purpose; and 3) consequences." *Town of Oxford v. Koste*, 204 Md.App. 578, 585–86, 42 A.3d 637 (2012). *Koste* notes that: "[t]ext is the plain

language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity." *Id.* (Citations omitted). Legislative purpose, either manifested in the text or gleaned from other sources, often informs, and may even control, our interpretation of the statute. *Id.* at 586, 42 A.3d 637. Finally, our examination "of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality." *Id.* (Citations omitted). This is one of those cases where the text of the relevant provisions is the predominate factor.

### B. Analysis

When first enacted in 1986 in response to an insurance crisis, the noneconomic damage cap applied in "any action for damages for personal injury." Although several years later, this Court concluded that this statutory language covered a wrongful death action, *Potomac Electric v. Smith,* 79 Md.App. 591, 558 A.2d 768, *cert. denied* 317 Md. 393, 564 A.2d 407 (1989), in 1993, the Court of Appeals disagreed. In *United States v. Streidel,* 329 Md. 533, 620 A.2d 905 (1993), noting, among other things, the absence of any reference to wrongful death in the damage cap statute and the limited nature of the damages subject to the cap, the Court concluded that CJP § 11–108 did not apply in a wrongful death case. In passing, the Court noted:

> The damages referenced in the cap statute would be recoverable in a survival action because a survival action allows for compensation for the pain and suffering endured by the deceased, as well as for loss of earnings and medical expenses, between the time of injury and the time of death. Damages recoverable under the Wrongful Death Act are measured by the value, pecuniary and otherwise, of the life of the deceased to the person entitled to damages. The cap

statute does not reference this latter type of damage, either expressly or by implication.

329 Md. at 544, 620 A.2d 905.[10]

The General Assembly quickly responded to *Streidel* in 1994 with legislation that can only be described as a compromise. *See* Chapter 477, *Laws of 1994*.[11] Rather than redefining an "action ... for personal injury" in CJP § 11–108 to include a wrongful death action, the Legislature distinguished between the two causes of action in all key sections of the cap statute. For example, in the definitional section, § 11–108(a)(2)(i), the statute defined noneconomic damages as:

1. In an action for personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and

2. In an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, marital care, parental care, filial care, attention, advice, counsel, training, guidance,

---

**10.** This Court has also noted these key differences between survival and wrongful death actions in *Jones v. Flood,* 118 Md.App. 217, 702 A.2d 440 (1997):

> In Maryland, two separate actions arise from a death caused by the negligence of another: a survival action and a wrongful death action. In a wrongful death action, specified persons may recover for injury to them as a result of the death of the tort victim. In a survival action, the personal representative may bring suit to recover for pain and suffering sustained by the decedent between the time of injury and death....
>
> Although originating in the same wrongful act or neglect, the two claims are quite distinct, no part of either being embraced in the other. One is for the wrong to the injured person and is confined to his personal loss and suffering before he died, while the other is for the wrong to the beneficiaries and is confined to their pecuniary loss through his death. One begins where the other ends, and a recovery upon both in the same action is not a double recovery for a single wrong but a single recovery for a double wrong.

*Id.* at 223–24, 702 A.2d 440. (Citations omitted).

**11.** For a comprehensive discussion of the legislative history of the 1994 legislation, *see Green v. N.B.S., Inc.,* 180 Md.App. 639, 654–55, 952 A.2d 364 (2008), *aff'd.* 409 Md. 528, 976 A.2d 279 (2009).

or education, or other noneconomic damages authorized under Title 3, Subtitle 9 of this article.

Nothing in this definition changed the nature of the damages recoverable in a survival action, *see* n. 10 and accompanying text, or altered the specific statutory provisions, *see* n. 1 *supra*, or caselaw on the distinctions between a wrongful death and a survival action. Although overruling *Streidel*'s holding that the cap could not apply to a wrongful death action, the General Assembly left undisturbed the Court of Appeals' conclusion that a survival action was one for "personal injury." 329 Md. at 544, n. 9, 620 A.2d 905.

■ A key battleground in this case is the impact of the Legislature's addition of the following language in § 11–108(b)(3):

(i) The limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by or through that victim.

(ii) In a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the limitation established under paragraph (2) of this subsection, regardless of the number of claimants or beneficiaries who share in the award.[12]

■ Goss argues that this language requires the aggregation for cap purposes of the damages in survival and wrongful death actions. Such a contention does violence to the text of the statute. Because the 1994 legislation did not erase the distinction between the two causes of action to reach Goss' proffered solution, we would have to somehow merge both paragraphs of § 11–108(b)(3), contrary to the intention of the Legislature and applicable caselaw.[13] Each paragraph of

12. *See also* CJP § 11–108(d) for provisions governing the reduction of a damage award when there are multiple claimants in a wrongful death action.

13. There is no doubt that the principal purpose of the change to § 11–108(b)(3) is to deal with multiple claimants in a wrongful death action. *See Green,* 180 Md.App. at 655, 952 A.2d 364.

§ 11–108(b)(3) stands alone, with a survival action falling under paragraph (i) and a wrongful death action being confined to paragraph (ii). Although paragraph (i) deals with multiple claimants in a personal injury case, it has no impact here because no "direct victim" is suing along with a derivative party. There is and could only be one plaintiff in the survival action—Jennings' personal representative.

This construction of § 11–108 in no way offends the general purpose of the statute in promoting the availability and affordability of liability insurance in Maryland. *See Oaks v. Connors,* 339 Md. 24, 34–35, 660 A.2d 423 (1995). While the 1994 legislature, like its 1986 predecessor, focused in part on this rationale in capping wrongful death damages, the State made no fundamental change to damage awards in personal injury cases, including a survival action.

Finally, our conclusion that the § 11–108 damage cap applies separately to damage awards in survival and wrongful death actions, does not conflict with our recent decision in *Leake v. Johnson,* 204 Md.App. 387, 40 A.3d 1127 (2012).[14] There we said that for purposes of the Local Government Tort Claims Act ("LGTCA"), CJP §§ 5–301 *et seq.,* and its $200,000

---

**14.** Our holding is likewise not inconsistent with the decisions in *Figgie International, Inc. v. Tognocchi,* 96 Md.App. 228, 624 A.2d 1285 (1993), and *John Crane, Inc. v. Scribner,* 369 Md. 369, 800 A.2d 727 (2002). In *Figgie,* which was tried before *Streidel* was decided, a manufacturer unsuccessfully argued in the circuit court that awards in a survival and wrongful death action should have been aggregated for purposes of applying the cap. 96 Md.App. at 235, 244, 624 A.2d 1285. Because by the time the case arrived here, *Streidel* had been decided and the 1994 legislation was not yet in place, we remanded the case for the circuit court to reinstate the full damage verdict and expressed no view on the aggregation issue.

In *Scribner,* a post-*Streidel* mesothelioma case, a circuit court applied the cap separately to damage awards in a wrongful death action and a survival action. After indicating that the wrongful death damages were appropriately capped under the 1994 legislation, the Court determined that damages in the survival action were impermissibly capped because the injury occurred before the enactment of the 1986 statute. *Id.* at 375, 620 A.2d 905. At no time did the Court suggest that if the cap had applied to the survival action, the two awards would have to have been aggregated and subjected to a single cap.

limitation on liability, damages for survival actions and for wrongful death were required to be aggregated. However, that conclusion turned on the particular language of the LGTCA, where the cap was keyed to claims that arise from "the same occurrence." CJP § 5-303. Quite simply, *Leake*'s holding flowed from the extremely narrow language of the LGTCA. The text and history of CJP § 11-108 are vastly different and they account for a different result in this case.

Accordingly, under CJP § 11-108(b)(3)(i), the $350,000 personal injury/survival action award here remains intact because it did not exceed the cap. Under § 11-108(b)(3)(ii), the combined wrongful death awards of $1,675,000 were properly reduced to 150% of the applicable cap. Thus, the circuit court did not err in establishing the total damage award at $1.37 million.

### IV. The State's Motion for JNOV

■■ Finally, both Goss and appellees assert that the circuit court erred in granting the State's motion for JNOV because the State: (1) mishandled the work crew and work zone safety; (2) failed to provide the inmates with proper protection; and (3) did not adequately train the inmates on how to safely cross the roadway. We disagree.

Again, upon review of the grant of a motion for JNOV, the sole issue before us is whether substantial evidence supports the jury's verdict. *See Romero*, 189 Md.App. at 290, 984 A.2d 346. In this case, it is apparent that the evidence was legally insufficient to establish that State personnel were negligent. Although some evidence was presented to suggest that it was unsafe for an inmate to cross the ramp into the gore on foot, it is undisputed that Jennings was fatally injured *after* he finished crossing the ramp, entered the gore and then ran back across the exit ramp into the path of Goss' dump truck. Thus, none of Jennings' evidence about the State directing an allegedly improper ramp crossing into the gore, or the methods used to train inmates or protect them while crossing the ramp into the gore and while working in the gore constituted

evidence from which the jury could reasonably determine that State personnel were negligent. Accordingly, the court properly granted the State's motion for JNOV.

## V. MTCA Damage Cap

Although conceding the issue was moot as a result of his ruling on the State's Motion for JNOV, the circuit judge went on to interpret the language of SG § 12–104(a)(2), which provides that under the MTCA, "[t]he liability of the State and its units may not exceed $200,000 to a single claimant for injuries arising from a single incident or occurrence." The court concluded that under this provision, if the State were liable, a damage award would be limited to $200,000 despite the presence of multiple plaintiffs in the case. The court focused on the fact that there was one victim and one accident.

Appellees and Amicus Curiae Maryland Association for Justice argue that the plain language of § 12–104(a)(2) establishes the cap for each "claimant" and that this case involves multiple claimants who are each entitled to a $200,000 award. The State emphasizes the word "single" in the statute and relies on a regulation of the State Treasurer, COMAR 25.02.02.02(D)(1) ("[A]ll persons claiming damages from . . . [b]odily injury to, or the death of, any one person shall be considered to be one claimant") and decades of State Budget Bill language declaring that the appropriation of State monies for MTCA judgments is "limited by State Treasurer's regulations" to payments of no more than $200,000 to a single claimant for injuries arising from a single incident or occurrence. *See, e.g.,* Chapter 482, *Laws of 2010* at Section 9(A).

The parties have not devoted a great deal of attention to the impact of this budget bill language and no one has argued that a limitation like Section 9(A) would constitute impermissible "legislating in the budget." *See Bayne v. Secretary of State,* 283 Md. 560, 576, 392 A.2d 67 (1978) (Although the budget bill is a "law" under Article III, § 52 of the Maryland Constitution, a budget condition may not amend substantive legislation).

Needless to say, our affirmance of the circuit court's granting of the State's motion for JNOV obviates any need to address these important questions. We will not consider them prematurely.

**JUDGMENT OF THE CIRCUIT COURT AFFIRMED. FOUR–FIFTHS OF THE COSTS TO BE PAID BY APPELLANT; ONE–FIFTH OF THE COSTS TO BE PAID BY CROSS–APPELLANTS.**